## CERTAIN-TEED PRODUCTS CORPORATION
### *v.* PARIS TOWNSHIP.

1. MUNICIPAL CORPORATIONS—ZONING—MINES AND MINERALS.
   The right to secure minerals from one's property may not be destroyed or withheld through a zoning ordinance, unless some very serious consequences will follow therefrom.

2. TOWNSHIPS—ZONING—GYPSUM MINING AND MANUFACTURING—INDUSTRY—AGRICULTURE.
   Township zoning ordinance which permitted gypsum mining and manufacturing operations in certain areas and subject to restrictions *held*, not, by itself, to have validly prohibited the project plaintiff gypsum company would have judically approved, in township area presently devoted to scattered light industry and agriculture (Paris Township Zoning Ordinance).

3. SAME—ZONING—GYPSUM PLANT—EXTENSION OF INDUSTRIAL ZONE.
   Extension of township industrial zone some 750 feet into agricultural or residential zone pursuant to ordinance authorization

REFERENCES FOR POINTS IN HEADNOTES
[1, 2]  58 Am Jur, Zoning § 97.
[3]  58 Am Jur, Zoning § 169 *et seq.*
[4]  58 Am Jur, Zoning § 96 *et seq.*

is ordered to depend upon reapplication to township board and zoning board of appeals and showing of protection for property in immediate vicinity of proposed gypsum plant as plaintiff applicant may then be able to make (Paris Township Zoning Ordinance).

4. DECLARATORY JUDGMENT—PROTECTIVE RELIEF—GYPSUM PLANT—EQUITABLE SUPERVISION—REMAND—NUISANCE.

Protective relief afforded inhabitants of township in gypsum company's suit for declaration of rights with respect to its proposed mining and manufacturing project in territory zoned largely for agricultural and residential uses is to permit erection of plant on pain of fulfillment of promises that surface use will not be interfered with through subsidence, dust or blasting, and that entire project may be closed by injunction if such enjoyment of surface uses is interfered with by what constitutes an enjoinable nuisance, the case being remanded for framing and hearing of a declaratory decree relative to defendants' right to equitable supervision and control of the project (Paris Township Zoning Ordinance).

5. COSTS—PUBLIC QUESTION—GYPSUM PLANT.

No costs are allowed in consolidated cases relative to plaintiffs' right to conduct gypsum mining and manufacturing operations in township zoned for industrial, agricultural and residential uses, public questions being involved (Paris Township Zoning Ordinance).

Appeal from Kent; Searl (Fred N.), J. Submitted January 16, 1957. (Docket Nos. 37, 38, Calendar Nos. 46,834, 46,835.) Decided March 5, 1958.

Action by Certain-teed Products Corporation, continued in the name of Bestwall Gypsum Company, both Maryland corporations, against Paris Township its township board and its zoning board and its zoning board of appeals, by way of appeal, to secure approval of applications for the erection of a gypsum manufacturing plant and for the extension of industrially-zoned area to afford additional space for operation.

Bill for declaration of rights by same corporations against Paris Township and certain landowners to establish right to erect gypsum manufacturing plant and mine gypsum in agriculturally-zoned area, and to enjoin interference with mining operations conducted in reasonable manner.

Actions consolidated for trial and appeal. From dismissal of zoning appeals and dismissal of bill for declaratory decree, plaintiffs appeal. Reversed and remanded.

*McCobb, Heaney & Dunn* (*Clausen, Hirsh & Miller*, of counsel), for plaintiffs.

*Vander Veen, Freihofer, Cook & Bryant,* for defendants.

*Amici Curiae:*

Gypsum Association by *Butzel, Eaman, Long, Gust & Kennedy* (*MacLeish, Spray, Price & Underwood*, of counsel).

Michigan State Association of Supervisors, by *Charles A. Larnard.*

EDWARDS, J.   Seven miles from the heart of Grand Rapids in Paris township a valuable deposit of gypsum rock has been discovered lying 240 feet below the surface.   In its processed form gypsum is widely used for plastering the walls of buildings and the making of plasterboard.   Prior to this discovery only 2 commercial deposits of gypsum were known to exist in Michigan, one in southern Iosco county, and the other south of Grand Rapids in Walker township.

A plaster manufacturing concern, the plaintiff here, discovered the deposit by geological exploration and has purchased options on the subsurface mining rights from the feeholders (principally farmers) of the land in 3 contiguous sections of the township. Plaintiff company also has options to purchase the fee to land along the Chesapeake & Ohio railroad adjacent to the 2 deposits where it desires to build its mine head and processing plant.

Most of Paris township, according to this record, is still essentially a rural township, but in the path of the growth of Grand Rapids suburbia. The western edge of the township bounds a portion of the city of East Grand Rapids; and in the northwestern portion of the township outside of the city limits there is new housing construction of the ranch-type, semirural variety currently greatly in vogue. While only a relatively few instances of this type of construction have as yet been built within a half mile of the proposed plant site, testimony of the defendants makes clear their anticipation of this sort of development for the whole township in future years.

Paris township has a township zoning ordinance adopted under the authority of State law, CL 1948 and CLS 1956, § 125.271 *et seq.* (Stat Ann 1949 Rev and Stat Ann 1955 Cum Supp § 5.2963[1] *et seq.*). Under its terms, all of the property optioned by plaintiff for mining purposes lies in areas zoned for agriculture. The property upon which plaintiff desires to build its plant lies within 1,250 feet of the Chesapeake & Ohio railroad. The zoning ordinance zones all land within 500 feet of the railroad for industrial use and allows an extension of such use by special permission up to an additional 1,000 feet.

Before proceeding to outline the history of this litigation it may be well to quote the applicable sections of the zoning ordinance upon which this

dispute turns. "G" agricultural zoning district is defined as follows:

"In the 'G' agricultural district, no buildings or parts thereof shall be erected, altered, moved upon any land therein or used, and no land shall be used, in whole or in part, for any purpose other than 1 or more of the following uses:—

"1. All uses permitted in the 'A' residence and 'B' residence districts.

"2. All accessory buildings and their use when the same are necessary and incidental to the pursuit of farming and agriculture.

"3. Roadside stands—   *   *   *

"4. Farm products, storage building and frozen food lockers—   *   *   *

"5. Milk pasteurization plants and poultry hatcheries—   *   *   *

"6. In this district, no building or land shall hereafter be erected, altered or moved into said district or used for the purpose of conducting any form of commercial, business or industrial enterprise whatever, except as stated in the foregoing provisions of this chapter."

The proposed plant site is affected by the following provisions relative to industrial zoning:

"All land lying along and adjacent to any railroad right-of-way to a depth of 500 feet on either side is hereby declared to be 'F' industrial district except as shown to be otherwise on the map; and by resolution of the township board, any such land shall become industrial to an additional depth of 1,000 feet, providing that application shall be made therefor in writing to the township board by any interested person, corporation or company desiring to so use such land or building or buildings thereon, clearly showing that the use to be made of such land or building, or both, forming such extension conforms with the provisions of this ordinance for such

use; and further providing that a public hearing be had."

Concerning the use of industrial "F" areas, the ordinance also stated:

"No building shall be erected, altered or moved upon any lot or piece or parcel of land in and comprising a part of this district, for any of the following uses, unless and until an application setting out the location and character of such use shall have been submitted to the township board and approved by such board, and provided that before the township board shall have so acted, a public hearing [shall be held].  *  *  *  If on such hearing it shall appear that the proposed user of the proposed location, including both the building or buildings or other structures, and the land upon which they are located would be likely to be dangerous or detrimental to the residents of the contiguous or nearby territory or contrary to public policy, safety, morals or decency, and detrimental to property values, such application shall be denied; such uses being designated as:  *  *  *

"3. Cement, lime, gypsum or plaster of paris manufacture."

The omitted portions of the quotation immediately above contain 19 other categories of manufacture or commerce which must acquire a township board permit before commencement of operation.

In November, 1954, plaintiff Certain-teed Products Corporation filed applications with the township board for permission to construct a gypsum manufacturing plant on the proposed plant site area, and for an extension of the industrial zone by 750 feet so that it would be 1,250 feet wide. Following a public hearing in December, 1954, the township board denied both applications.

The zoning board of appeals refused to hear the case because of claimed lack of jurisdiction, and

plaintiff appealed to the Kent circuit court as permitted by CL 1948, § 125.293 (Stat Ann 1949 Rev § 5.2963[23]) which is section 23 of the township rural zoning act. Subsequently plaintiff also filed bill of complaint for a declaratory decree under the declaration of rights statute, CL 1948, § 691.501 *et seq.* (Stat Ann § 27.501 *et seq.*), to establish its right to erect its plant in the industrial zone and to have said zone extended 750 feet, and to declare that the township has no authority under its zoning ordinance, or otherwise, to prevent or interfere with the mining of gypsum in a reasonable manner. The prayer for relief also sought appropriate injunctive relief against the township. The appeals to the circuit court and the chancery action for a declaratory decree were consolidated for hearing and are also consolidated in these appeals by stipulation.

The circuit judge decided both cases against the plaintiff. He dismissed the appeals from the administrative decisions of the township boards pertaining to the plant site applications.

Concerning the proposed plant erection he held (1) that the zoning ordinance was a constitutional delegation of authority by the township legislature as a reasonable standard is set up therein for the functioning of the zoning board; (2) that appeal to the circuit court from the board of zoning appeals (according to section 23 of the township rural zoning act) is a hearing by review and not *de novo;* and (3) that the action of the township board in denying plaintiff's application to erect was not capricious or arbitrary, and there being "a debatable issue" before it, the court could not interfere.

The circuit judge also dismissed the bill of complaint for a declaratory decree.

Concerning the proposed mining venture he held (1) the township rural zoning act permits the regulation of mining operations, mining being a "use"

within section 3 thereof; (2) the Paris zoning ordinance prohibits subsurface mining because, although it doesn't do so expressly, the chapter dealing with agricultural use of land does not list subsurface mining as a permitted use; and (3) that an ordinance prohibiting subsurface mining altogether is not unconstitutional as violative of due process if it is reasonable and the Paris ordinance is not unreasonable.

Because of the foregoing, the trial court felt it unnecessary to make a determination on the requested 750-foot extension of the industrial zone.

Subsequent to the trial referred to above, Bestwall Gypsum Company purchased Certain-teed Products Corporation and succeeded to its rights in this litigation. For convenience, we refer to the 2 companies as "the plaintiff."

Some additional miscellaneous facts relied upon by the opposing parties should be recited from this voluminous 919-page record before we seek to identify and decide the basic legal issues which are involved.

Plaintiff points, for example, to the essentially rural character of the 3 sections in which it contemplates operation, and exhibit 5 seems to indicate that only 10 residences are to be found in the 3 sections concerned. Only 2 of these appear to be as close as 1,000 feet to the proposed plant. Plaintiff also calls attention to the existence of a nonconforming use consisting of a slaughterhouse in the southern portion of section 24, perhaps 1,800 feet away from the proposed plant site. It argues that the odor from this slaughterhouse adversely affects the immediate area for residential purposes.

Defendants point to the developing residential area in the northwest section of the township, most of which development is admittedly a mile or more away, and to the existence of the small village of

East Paris which runs north from the railroad right-of-way immediately across the industrial zone from plaintiff's proposed plant site. Defendants' basic objection concerning which most of this record has been written pertains to their claim that gypsum manufacturing produces dust in such quantity as to become a nuisance to residences in the neighborhood and to have a deleterious effect upon the present and future development of the township. They also refer to the possibility of residential damage due to the underground blasting operations of the company in its mining work. They also contend that truck and automobile traffic will be considerably increased, to the detriment of the township. They also contend that surface subsidence due to mining may be anticipated in the future with adverse effects upon the township.

To these arguments plaintiff responded by testimony asserting that it intends to build a thoroughly modern plant with the most efficient electrostatic dust-arrester equipment available. It also indicated an intention to mine by a millisecond system of blasting whereby smaller charges are set off in very rapid succession to obviate the shock effect of a single larger blast. It further indicated that the plant will provide off-street parking for its employees, and will use only approximately 20 trucks per day in the distribution of its product due to railroad facilities nearby. It argued that modern mining methods and the depth of the contemplated operation will guarantee against surface subsidence.

Plaintiff likewise argued that the plant, if built, will allow employment of 250 new employees, mostly from the Grand Rapids area, with a contemplated payroll of $1,250,000 to $1,750,000 a year, and that, in the event the combined mining and manufacturing scheme proposed cannot be conducted here, the extraction and use of the gypsum rock is made econom-

ically impossible because of cost factors involved in transporting it to another manufacturing site.

While in general what we have said outlines the factual situation confronting this Court and describes the positions of the parties, additional facts may be added in our discussion of some of the legal issues which follows.

Basic to our determination of this cause is the question as to whether or not the township zoning ordinance, applicable portions of which we have quoted, is unreasonable and unconstitutional as claimed by the appellant. While we will have occasion to pass upon specific provisions of the ordinance in their application to the currently-considered problem, our review of the provisions of the zoning ordinance which have been called to our attention indicates that it is in general a customary sort of township zoning plan apparently suitable to the needs of a township largely rural in character but located in the path of an urban development.

The general provisions which restrict most of the undeveloped areas to agricultural or residential uses seem appropriate to the circumstances shown by the testimony and nothing is called to our attention to indicate that less than adequate provision is made for commercial development and industrial development. The zoning of 500 feet on each side of the Chesapeake & Ohio right-of-way as it travels through the township appears logical and should provide for more balanced development of the township in the future. In all of these respects we believe that the township board in adopting this ordinance acted well within its legislative discretion.

A somewhat more difficult question is posed by the specific provisions of the ordinance which require, as to certain types of industry, specific approval by the township board prior to the granting of a permit for construction in the industrial zone.

This Court has previously held that such a requirement which places the existence or nonexistence of a particular business or industry wholly at the discretion of the administrative board represents an unreasonable and unconstitutional invasion of property rights in the absence of standards for the exercise of such discretion previously determined by legislative action in the zoning ordinance itself. *Osius* v. *City of St. Clair Shores,* 344 Mich 693. See, also, *Taylor* v. *Moore,* 303 Pa 469 (154 A 799). Plaintiff and appellant in this case claims that the requirement of the special permit for location of a gypsum plant in the industrial zone is unreasonable and unconstitutional because no such standards are set.

As quoted above, this disputed provision of the zoning ordinance provides, as to 20 categories of manufacturing or commerce, for special application to the township board and a public hearing. The paragraph further provides:

"If on such hearing it shall appear that the proposed user of the proposed location, including both the building or buildings or other structures, and the land upon which they are located would be likely to be dangerous or detrimental to the residents of the contiguous or nearby territory or contrary to public policy, safety, morals or decency, and detrimental to property values, such application shall be denied."

We have reviewed the list of 20 uses. As noted by the circuit judge, included in these uses are abattoir or slaughtering or rendering plants, crematories, distillation of bones, explosives, fertilizer manufacture, gas manufacture, glue manufacture, along with "cement, lime, gypsum or plaster of paris manufacture." We agree with the circuit judge that where the Paris township zoning ordinance calls for a strip of industrial zoning of 500 feet on each side

of a railroad track through an otherwise largely agricultural or residential area, that the delegation of power in that ordinance to an administrative board to make a finding as to whether certain specific industrial uses generally of a variety most likely to be injurious to residential purposes will in the particular instance indeed injure the immediate vicinity, represents a proper delegation of authority for finding of fact. 8 McQuillin, Municipal Corporations (3d ed rev), §§ 25.150, 25.177; *City of Detroit* v. *S. Loewenstein & Son,* 330 Mich 359; *In re Brewster Street Housing Site,* 291 Mich 313.

See, also, *Baura* v. *Thomasma,* 321 Mich 139.

Upon even stronger grounds, we believe that the provision of the zoning ordinance which will allow for the extension of the industrial use for an additional depth of 1,000 feet into otherwise argiculturally or residentially restricted area only upon special application and finding that such extension would not injuriously affect the neighborhood contiguous thereto represents a provision warranted by the particular circumstances and is neither unreasonable nor unconstitutional in its general form.

Thus we agree with the circuit judge that the currently-considered zoning ordinance in all of these general provisions appears to be a reasonable and proper exercise of legislative authority in the formulation of a plan for growth and development of the township concerned.

This, however, by no means disposes of these appeals. For appellant preserves for our review its contentions advanced in the circuit court below: (1) that the action of the township board and the township zoning board of appeals in refusing its application for construction of a gypsum manufacturing plant was against the preponderance of the evidence, and was arbitrary and capricious; and (2) that the zoning ordinance did not, and could not, constitu-

tionally restrain its subsurface mining operation in the agriculturally-zoned sections.

The first of these questions requires us to review the proceedings by which the township board refused plaintiff's application for the construction of a gypsum manufacturing plant, to be located partially in the industrially-zoned area, and likewise refused a requested 750-foot extension of that industrially-zoned area for the same purpose. It appears that such township fact finding as was done on this important topic was done by 5 members of the township board during a brief recess of a public hearing attended by many of the residents of Paris township.

We have reviewed some 60 pages of transcript of this hearing. It appears that it was called after applications had been filed by plaintiff and after some 600 objectors had signed a petition to the township board objecting to the applications. Of the names on the petition, it was stated at the public hearing (apparently without dispute) that only 81 lived within 1 mile of the proposed plant, that 151 lived between 1 mile and 2 miles of the proposed plant, that 160 lived between 2 miles and 3 miles, and that 269 lived between 3 and 5 miles from the proposed plant. It appears to this Court to be a fair deduction from a review of this public hearing that the audience came thoroughly committed to blocking the construction of this plant, and that the crucial decision by which the circuit judge felt himself bound on the fact problems involved in this case was made by 5 members of the township board under the immediate impact of their constituents. Perhaps the nature of this decision may be revealed most specifically by the closing page-and-a-half of exhibit 23, the transcript of the proceedings of the township meeting:

*"Mr. Heaney:* Does that mean regardless of the truth of the allegations and statements made by the petitioner that the objectors have the same objections?

*"Audience:* We don't want it. We want our zoning laws upheld.

*"Supervisor Oosterhouse:* The hearing is closed and the board is going to take a recess for one-half hour.

*"Audience:* We don't want another Sheppard trial.

*"Audience:* Mr. Chairman. Before you adjourn, there are quite a few people in this township that are not familiar with our board members. I wonder if they would stand up and identify themselves.

*"Board Member:* Joseph Bravata, trustee.

*"Lady:* How many years have you been on the board?

*"Mr. Bravata:* A year and 8 months.

*"Board Member:* William Potter.

*"Lady:* How long have you been on the board?

*"Mr. Potter:* 7 years.

*"Board Member:* Cy Fisher. Took over the treasurer's job the 1st of November. Mr. Auble resigned.

*"Board Member:* Fred Darling. Tonight is my first night.

*"Audience:* Where are the other 2 and why aren't they there? Who are the other 2?

*"Supervisor Oosterhouse:* Mr. Friend and Mr. Kloosterman. We asked them not to stay because they have no right to vote on this issue.

*"Audience:* Why?

*"Supervisor Oosterhouse:* The board passed a resolution. You may not vote—nor to discuss—it because they have property.

*"Board Trustee:* It was moved by Joe Bravata and seconded by Cy Fisher resolved to deny the petition of Certain-teed Products Company for the extension of the industrial zone along the C&O an addition of 750 feet between M-37 and East Paris. It was carried unanimously. (Applause.) It was

moved by William Potter, seconded by Joe Bravata resolved that the petition by the Certain-teed Products Company to manufacture gypsum under an area 1,200' in width south of the C&O between M-37 and East Paris be denied. That was also carried unanimously. (Applause.)"

Subsequent to the denial of these applications by the township board, plaintiff sought an appeal from the decision of the township board to the zoning board of appeals under the authority of the township rural zoning act. CL 1948, § 125.290 (Stat Ann 1949 Rev § 5.2963[20]). The township zoning board of appeals refused to entertain the appeal on grounds of lack of jurisdiction.

It is apparent to us from this record that plaintiff-appellant never had other than a cursory (even though formally courteous) hearing before the township board. It appears to us that the fact issues were largely determined by the board under the impact of a completely-committed audience reaction, and that plaintiff was denied its right under the zoning ordinance for a review of this decision by the zoning board of appeals.

We cannot approve of disposing of an issue of such magnitude in such fashion. While the local township board and zoning board of appeals had every reason to keep the interests of their homeowners distinctly in mind, they certainly likewise had the duty to give proper consideration to a petition for the building of an important industry in an area zoned for industry capable of creating 250 jobs and a $1,250,000 payroll, particularly when said petitioner made a showing, without substantial dispute, of an intention to avoid in the construction of its plant any nuisance to the neighborhood not ordinarily associated with any industrial use.

The township board in denying these applications made no findings of fact as to what, if any, portion

of the application for the proposed plant represented
a violation of the standards set forth for their con-
sideration in the zoning ordinance. As noted, the
zoning board of appeals refused to entertain any
appeal, in obvious violation of CL 1948, § 125.290
(Stat Ann 1949 Rev § 5.2963[20]). In neither in-
stance did the local boards comply with the last
sentence of the section of the township rural zoning
act cited above: "The grounds of every such deter-
mination shall be stated."

In subsequent testimony before the circuit court
members of the board unanimously denied any rea-
son to dispute the representations of plaintiff as to
the enclosure of plant and mine head in 1 building,
as to the installation of modern electrostatic dust
precipitators, or as to effective control of dust from
its manufacturing operations.

John E. Oosterhouse, supervisor of Paris town-
ship and a member of the township board, who was
in charge of the meeting, testified, in part, as fol-
lows:

"I did understand that and believe that they were
willing to install modern, efficient, dust and smoke
arresting equipment. I didn't know that that equip-
ment would comply with the strictest smoke and dust
ordinances in general use for the regulation of in-
dustrial plants in municipalities. I had no reason
to disbelieve that statement when they stated that.
When they said it would require between 250 to
300 employees nearly all of whom would be recruited
in the Grand Rapids area, and that the payroll would
average from $25,000 to $30,000 a week, or from a
million and a quarter to a million and three-quarters
a year, I had no reason to doubt the accuracy of
that statement. And when they stated that the park-
ing facilities with respect to the plant would be on
their own properties and off the highways, I had
no reason to doubt that. When on behalf of the
company it was offered that the resolution approv-

ing the use be conditioned upon an agreement that the company would protect and save harmless the water supply of the adjacent property owners from either diminution or pollution by virtue of the applicant's manufacturing operation, I had no reason to doubt that.

"I thought the company was financially able to stand back of such a guaranty. * * *

"I recall that at this meeting the objectors objected to visiting a plant or delaying the decision until the plant could be seen. I recall that there was a plan that the board would adjourn for a week after the hearing of October 20th to examine the evidence that had been presented and permit the submission of briefs to the board's attorney by the attorneys for the objectors and by Certain-teed's attorney. I recall that the members of the objectors and the attorney for the objectors did not want any adjournment for that purpose. They wanted a decision that night.

"I did not have an opportunity at the hearing itself to read the exhibits that were presented at the December meeting. I was acting as chairman. I wasn't too close. I don't recall that at the close of that meeting that you requested me to the extent I hadn't had an opportunity of reading these, to take them with me to the board meeting and examine them. These were not taken downstairs that night. I never had an opportunity or I have never read the typewritten and printed parts of these exhibits. I just looked at the pictures so far as I could see them from the board table. When the board met about the first thing that was decided was not to extend the zoning, the way I remember it. We decided not to extend the zone and decided not to grant the plant.

"I was a member of the board when the township appointed the present attorneys to represent it in the case in circuit court."

Testimony nearly identical with that which has been quoted above is contained in this record from

the other 4 members of the township board who voted on this issue.

We believe that a fair summary of such testimony as was given by these board members as to their reasoning in denying the applications for this manufacturing plant is that they were strongly affected by personal knowledge of and evidence pertaining to the carrying on of gypsum manufacturing and mining in the so-called Butterworth area during a period of 100 years or more in the past.

Practically all of the testimony pertaining to dust conditions and to vibrations from mine blasting and ground subsidence pertains to this old operation. It appears that the gypsum mining and manufacturing industry, of which plaintiff is a part, had been anything but a good neighbor in its Butterworth area operations.

Against plaintiff's offer to avoid these same conditions by modern plant construction, modern dust removal methods, and modern mining methods, and to have approval of its application conditioned upon strict observance of such representations, the members of the township board indicate no factual knowledge to the contrary but a retention of "doubt" which apparently tipped the scales. We believe this record indicates that appellant's application to the township board received the form, but not the fact, of administrative due process.

Against the background of such a hearing and decision by the township board acting in an administrative capacity for finding of fact in relation to plaintiff's 2 applications, it is doubly unfortunate that the statutorily-provided appeal to the township zoning board of appeals was denied. It is apparent from the language of the statute that the purpose of this appeal is to grant a more careful and orderly review than might be had at the administrative level. The zoning board of appeals under the statute may

"reverse or affirm, wholly or partly, or may modify the order, requirement, decision or determination as in its opinion ought to be made in the premises." CL 1948, § 125.293 (Stat Ann 1949 Rev § 5.2963[23]).

The zoning board of appeals plainly had jurisdiction. It was an abuse of its discretion to fail to hear plaintiff's appeal and make the required determination thereupon. We agree with the trial judge in his tentative conclusion that the zoning board of appeals had jurisdiction to review the action of the township board, and we likewise agree with him that, since plaintiff had completely exhausted its administrative remedy, it was entitled to a review of the action of the township board and of the zoning board of appeals by the court.

We do not deal here with a local legislative body's adoption of a zoning ordinance. Rather, we are concerned with appeals from administrative decisions of 2 township boards authorized by statute to make such decisions based upon findings of fact. Specific authority for appeal from the decisions of the administrative boards in question is contained in the township rural zoning act, CL 1948, § 125.293 (Stat Ann 1949 Rev § 5.2963[23]). Into any such administrative decisions pertaining to zoning there should enter not only proper consideration of the preservation of adequate space for quiet residential development, but also the stake of the local community and the State in the provision of employment and growth of industry.

This township did not seek to exclude industry from its borders. By its industrial zoning it offered industry sites for development. When a particular industry sought location in its industrial zone, the township boards could not act to exclude it because of whim or caprice. The right to carry on a lawful business must not depend on the whim of any man.

*Osius v. City of St. Clair Shores, supra; Robison v. Miner & Haug,* 68 Mich. 549.

Nor should the administrative board in such an important decision rely upon a captious doubt of the representations made by the industrial petitioner as to the way it will conduct its business. Technological change makes possible tremendous differences in the operations of industry. And we feel that a review of this record reveals competent and undisputed testimony that plaintiff can build and operate, and intends to build and operate, an industrial plant and mine head completely enclosed and equipped with such modern dust-control devices as to make it comparable as a neighbor to any major industrial installation.

It is apparent that plaintiff was defeated in its township applications primarily because of the bad record as neighbors which the plaster industry generally had developed for itself in its older unregulated Butterworth area operations. Ample power to compel adherence to the dust-free standards lay in the township boards and may now be exercised by the court. The history of bad neighborliness upon which the defendants rely suggests and requires strict regulation. It does not, in our view, support exclusion of a plant proposed to be built to modern and totally different standards.

The Paris township zoning ordinance provided for certain special classes of industry, including this one, to be admitted to its industrial zone upon proper application. Denial of such an application must of necessity be related to the standards of the township zoning act and to evidence that the contemplated use under the application would be more injurious to the surrounding neighborhood than normal industrial uses for which no special application was provided. Any other interpretation of these provisions would deny to those industries singled

out for special application the equal protection of the law. US Const, Am 14.

We cannot find in this record that the township board or the circuit court had before them facts which indicated that petitioner's contemplated plant operation, if built and operated to its represented standards, would offend the standards of the ordinance or be more objectionable than many other industries able to locate in the same district as a matter of right under the local ordinance.

In *In the Matter of Long Island Lighting Co.* v. *Griffin,* 272 App Div 551 (74 NYS2d 348), aff'd, 297 NY 897 (79 NE2d 738), in a situation where the facts calling for restriction were much stronger than those in this essentially rural neighborhood, the court held as follows (syllabus 1):

"Petitioner owns property in an area classified under the zoning ordinance of the town in which it is situated as an industrial use district. A variety of industrial uses are permitted in such area under the zoning ordinance. Other industrial uses are expressly permitted, inclusive of gas manufacture from coal, coke or petroleum, or storage thereof, subject to authorization by the board of zoning appeals. Petitioner has been denied permission to erect a gas manufacturing plant and storage holder on this property upon the grounds that it would injure the appropriate use of the neighboring property and that the location had not been established to be the only suitable site. There is no question as to the need for additional facilities. The area is concededly industrial and no residence is nearer than 1,200 to 1,500 feet from petitioner's proposed plant, in which modern equipment is to be used to eliminate dust, pollution of water, noise and odors. Since it is evident that the proposed plant is less detrimental to neighboring property than other uses freely permitted in that industrial district, the board is directed to grant permission for the erection of

the plant and holder, subject to such reasonable conditions and safeguards as it may impose."

See, also, *Mitchell Land Co.* v. *Planning & Zoning Board of Appeals of the Town of Greenwich,* 140 Conn 527 (102 A2d 316); *Faucher* v. *Grosse Ile Township Building Inspector,* 321 Mich 193.

Under the situation of fact and law which we have outlined, we hold that the denial of plaintiff's application for construction of a gypsum manufacturing plant to the extent that it could be built in the industrial zone in Paris township was arbitrary and capricious and represented an abuse of discretion on the part of the township board and the zoning board of appeals. We further hold that the application should have been granted, conditioned upon plaintiff's representations as to plant construction and operation, and that the court below was in error in failing to enter such an order.

We do not think, however, that the reasoning above necessarily applies to the second of plaintiff's applications—namely, that which seeks a 750-foot extension of the industrial zone into the agricultural and residential zone. Under the ordinance, this extension is not a matter of right for any industrial use. Plaintiff plainly had a duty to show that such a grant would not offend against the uses permitted in the "G" zone. We cannot say, particularly in view of the testimony pertaining to the Bakker home, that plaintiff had satisfactorily carried that burden. On this issue, we agree with the trial judge. We do not find that on this issue the decision of the township board is arbitrary or capricious or against the great weight of evidence.

At oral argument of this matter before this Court, counsel for plaintiff indicated that they could locate their plant and mine head wholly inside the industrially-zoned area paralleling the Chesapeake & Ohio

tracks. We believe that any extension of this zoning should depend upon reapplication to the township board and zoning board of appeals and upon such showing of protection for the property in the immediate vicinity as plaintiff may be able to offer at that time.

We turn now to the most interesting and most puzzling of the legal problems raised by this litigation—the problem of the effect of zoning upon subsurface mining.

This issue, though frequently referred to at the township board hearing, was not actually involved in the applications before the township board or zoning board of appeals, nor is it involved in the appeal therefrom. It was raised by the bill for declaratory decree heard at the same time as the appeal before the circuit judge and, like the appeal, was decided adversely to the plaintiff.

The circuit judge held that the township rural zoning act authorized prohibition of deep mining in township zoning ordinances, that the currently-considered zoning ordinance prohibited deep mining in the agricultural zone, and that both the statute and the ordinance were reasonable and constitutional when applied to the current set of facts. In effect, he held that zoning powers paralleled the historic concept of ownership by extending *ad coelum et ad infernos* to the heavens and to the depths.[*]

We do not believe this concept is justified. Zoning is founded upon local government's use of police power. The prohibition which it directs against certain uses of land have from the outset been limited to reasonable restriction of uses of land which could be held detrimental to the health, morals and welfare of the people of the surrounding community.

* Coke Litt., p 4a.
See, also, an interesting critique, Logan, Aircraft Law—Made Plain, p 14.

The test as stated by the supreme court in the historic case of *Village of Euclid* v. *Ambler Realty Co.*, 272 US 365, 395 (47 S Ct 114, 71 L ed 303, 54 ALR 1016), is quoted thus:

"It must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare."

It does not appear that the application of zoning to deep mining has been previously considered in relation to this test, except in those instances where surface manifestations of the mining were the crucial matters before the court.

In a great number of instances courts have considered the problem of removal of minerals from the land where the removal process itself was alleged to interfere with the health, safety, and general welfare of the community concerned. In the following cases, representing many different fact situations, courts have refused to enjoin the surface mining of minerals largely on the ground that the community, under the guise of zoning, could not deprive a property holder of the right to use a valuable portion of his property unless such prohibition was reasonably related to the health, safety, or general welfare of the community. *People* v. *Hawley*, 207 Cal 395 (279 P 136); *Village of Terrace Park* v. *Errett* (CCA), 12 F2d 240; *Town of Harrison* v. *Sunny Ridge Builders, Inc.*, 170 Misc 161 (8 NYS2d 632); *East Fairfield Coal Co.* v. *Booth*, 166 Ohio St 379 (143 NE2d 309). See, also, *City of Pittsfield* v. *Oleksak*, 313 Mass 553 (47 NE2d 930).

In other fact situations, however, the courts have held that surface mining, or the surface activities of mining, may indeed be restrained by zoning ordinances and injunctive relief granted thereunder

where reasonably related to the good and welfare
of the immediate community. *Marblehead Land Co.
v. City of Los Angeles* (CCA), 47 F2d 528; *Town
of Burlington* v. *Dunn,* 318 Mass 216 (61 NE2d 243,
168 ALR 1181); *West Brothers Brick Co., Inc.,* v.
*City of Alexandria,* 169 Va 271 (192 SE 881);
*Beverly Oil Company* v. *City of Los Angeles,* 40
Cal2d 552 (254 P2d 865); *People* v. *Calvar Corpo-
ration,* 286 NY 419 (36 NE2d 644, 136 ALR 1376);
annotation, 168 ALR 1188.

In the *Marblehead Case,* the drilling of oil wells
in a residential neighborhood, with the attendant
erection of derricks, machinery, tanks, et cetera,
was held to be subject to prohibition by zoning, and
such a restriction in a built-up residential neighbor-
hood was held reasonable and constitutional.

In the *West Brothers Brick Company Case, supra,*
while upholding zoning which prohibited the open
mining of valuable clay beds, the supreme court of
appeals of Virginia said (p 285):

"These principles are well recognized in Virginia.
Private property shall not be taken or damaged for
public uses without just compensation. Constitution
of Virginia, § 58. Likewise we are told that the
exercise of the police power of the State shall never
be abridged. Constitution of Virginia, § 159. We
would be less than frank if we did not concede that
those 2 great principles clash at times."

And in seeking to resolve the stated conflict, the
same court quotes with approval (pp 285, 286):

"It is not contradicted that the legislature may
confer the police power of the State upon cities and
towns located therein. The extent of this power is
difficult to define, but it is elastic and expands auto-
matically to protect the public against the improper
use of private property to the injury of the public
interest. It must never be exercised except in a

reasonable manner and for the welfare of the public."

This Court has considered a somewhat similar problem in *City of North Muskegon* v. *Miller,* 249 Mich 52. There, it upheld as reasonable and constitutional a local drilling ordinance under which the drilling of a proposed oil well was forbidden, where there was evidence that the drilling of this well was likely to interfere with the community's water supply.

In a recent case, *Township of Bloomfield* v. *Beardslee,* 349 Mich 296, this Court has considered the removal of gravel by surface mining and upheld the injunctive relief granted by the court below on grounds of nuisance (majority view) or reasonable zoning (minority view).

It thus appears from the authorities quoted above that the test of constitutionality of a zoning ordinance is its reasonable relationship to the good and welfare of the general public.

Our remaining questions become (1) is deep mining an excluded use of land within the meaning of the Paris township zoning ordinance; and (2) if so, does such prohibition bear a reasonable relationship to the good and welfare of the general public?

The circuit judge reasoned, in relation to the first question, that the ordinance was so drafted as to exclude all except specifically-permitted uses and, hence, since mining was not specifically permitted, that it was excluded. We believe that this represents a reasonable construction of the ordinance as it is drawn.

In this aspect of the appeals before us, we have previously noted we deal with a proceeding in equity wherein plaintiff seeks a declaratory decree and injunctive relief. In such a situation we hear the matter *de novo* on the record made in the court be-

low. CL 1948, § 691.502 (Stat Ann § 27.502); *Oakland County Drain Commissioner* v. *City of Royal Oak,* 306 Mich 124; *Palman* v. *Reynolds,* 310 Mich 35.

Plaintiff clearly demonstrated that it had located and acquired property rights in valuable gypsum deposits lying in a stratum 240 feet below the surface and as to which it had access through adjacent industrially-zoned property. Plaintiff claimed and presented testimony to the effect that the removal of such deposits could be accomplished without interference with the normal use or employment of the surface of the land by the surrounding community. Defendants' pleadings and proofs sought to contradict this claim in 4 instances, with which we shall deal subsequently.

For the moment we indulge the assumption (undoubtedly true to a limited noncommercial degree on this record) that plaintiff could remove some of its gypsum deposit under the agriculturally-zoned land through a mine shaft in the industrial corridor without any interference of any kind with the enjoyment of the surface by the residents of Paris township. Is a zoning ordinance which is held to ban deep mining of this character valid and constitutional as to this prohibition?

On the precise point in question little precedent is cited to us and our research discovers little. Plaintiff places reliance upon an early case involving coal-mining rights, *Pennsylvania Coal Company* v. *Mahon,* 260 US 393 (43 S Ct 158, 67 L ed 322, 28 ALR 1321).

This was not a zoning case. The problem considered is, however, somewhat germane since Justice Holmes, for a majority of the court, held unconstitutional a Pennsylvania statute, founded upon State police powers, which would have required the pillar method of mining in order to maintain support under public roads and private homes where the coal

company owned mining rights which excluded any duty of support. The Holmes opinion appears not to have been specifically overruled, although, inasmuch as it might be held applicable to zoning, it has obviously been distinguished by *Village of Euclid* v. *Ambler, supra,* decided some 4 years later. The strong dissent in the *Mahon Case* authored by Justice Brandeis argued for upholding the constitutionality of the statute on the ground that it was designed to protect "paramount rights of the public." *Pennsylvania Coal Company* v. *Mahon, supra,* p 417.

Another Pennsylvania coal case may well help to explain the lack of authority on the relationship of deep mining to zoning. In *Mutual Supply Company Appeal,* 366 Pa 424 (77 A2d 612), the Pennsylvania supreme court was confronted by a coal company's contention that a single-resident zoning restriction in a built-up residential area known as Upper St. Clair township was an unconstitutional deprivation of property rights in that it prevented its erection of a mine head and tipple on the land thus zoned. The court upheld the ordinance, pointing to alternative means of access to the coal through other openings and declining to pass on the question which would be presented if there had not been other means of access. In passing, it commented on the fact that for 3 years the petitioner's entire mining operation had been done beneath Upper St. Clair township and said (p 427): "And, at no time, was the mining and removal of such coal from beneath the surface of Upper St. Clair township a subject of complaint or objection by the township or its officials."

It appears that there was no complaint because there was no hurt. It is probable that there are mining operations as remote in practical effect from surface uses sought to be regulated in a local zoning

ordinance as is the flight of a satellite somewhere out, in space.

To the extent that plaintiff can effectively mine its gypsum without any interference of any kind with normal surface uses and living, we hold that any zoning prohibition would plainly be unconstitutional as not founded upon any public need.

Finally, we turn to defendants' claims that the commercial mining actually contemplated by plaintiff does contemplate surface manifestations which will prove injurious to the community and which, hence, serve to warrant the zoning prohibition.

These surface manifestations are (1) a claim of probable surface subsidence in the surface of the ground below which the gypsum is to be removed; (2) a claim of threatened damage to homes and nuisance to people in the surrounding township through blasting operations; (3) a claim of possible interference with neighboring wells; and (4) the erection of 6 small buildings to house blowers for ventilation of the mine.

As to the first of these surface manifestations, plaintiff's pleadings and testimony claimed (1) that its options were for mining rights with a guarantee of support for the surface retained by the feeholder; (2) that the modern pillar method of mining and the depth of the stratum would guarantee against subsidence; and (3) that the mining operation to be followed would employ the pillar method.

Defendants' pleadings generally denied these contentions, but the testimony presented failed to challenge any of the 3 contentions listed above. The trial judge cited as a fact that testimony established that there were sinkholes in the older Butterworth mining area. Witnesses had testified that in some of the old mining operations in that area no effort to prevent ground subsidence had been made. Here

again we are confronted by doubts related to the past unregulated history of this industry.

There being no dispute but that proper modern mining methods can prevent surface subsidence, we again hold that strict regulation by court decree in accordance with the stated intentions of the plaintiff will offer proper protection to the township and eliminate the necessity of economic loss to the local community and the State, as well as to plaintiff, which would be involved in outright prohibition of any mining.

Much the same situation pertains to the second of defendants' claims as to fears of disturbance of the township from blasting operations incident to plaintiff's proposed mining. Again, plaintiff claims that modern blasting processes involving "a millisecond" blasting scheme can loosen quantities of gypsum in commercially useful amounts without property damage or noise sufficient to affect township residents. Plaintiff offers to submit to strict regulation of its blasting operations through court decree.

Again, it seems feasible to contemplate strict regulation of a character calculated to prevent any interference with the normal enjoyment of their property by township residents through any blasting which plaintiff may do. In this regard, a flat prohibition upon nighttime blasting would seem desirable under the circumstances, as would a requirement of the use of the proposed "millisecond" method and, at the discretion of the circuit judge, any limitation upon weight or power of charges which further testimony upon this point may seem to him to be required to prevent interference with the rights of defendants and those they represent.

As to the third issue, no substantial testimony was presented as to any likelihood of interference with the well-water supply of the neighboring community. It appears undisputed that a basic water supply un-

derlies the township in the so-called Marshal formation which lies at a 340-foot level, well below the contemplated gypsum mining. Plaintiff, while denying any likelihood of interference with shallower wells in the so-called "drift," offers a bond to compensate for any actual interference which might occur. It is obvious that if this problem were to be a basis for restraint of mining here, it is likewise present as a possibility in every deep-mining operation within the State of Michigan, and that a logical extension of a prohibition based upon this argument would forbid all mining in the State. While posting of bond does not represent a guarantee against possible inconvenience and the necessity of deeper drilling of neighboring wells, it seems a reasonable measure under the circumstances.

The fourth surface manifestion of plaintiff's proposed mining operation which is called to our attention is the need for small buildings described as approximately the size of a garage, located over mine ventilating shafts and housing blower equipment. In number, there is estimated to be a requirement of 3 such buildings in the entire mining operation. In the rural area described to us, this appears to represent a minor variation in nowise inconsistent with the basic plan of agricultural zoning, and for which a proper application for variance should be made, together with a description of construction and architecture to be used suitable to the plan of the community.

On the basis of evidence presented to us in this record, we believe that this potentially important mining and industrial operation can be conducted in Paris township consistent with the zoning and development plan of the community. It is apparent that this is an industry which, if it is to exist anywhere, must exist here. We believe the public policy of the State is calculated to encourage both manu-

facturing and mining. CL 1948, § 125.271 (Stat Ann 1949 Rev § 5.2963[1]); CL 1948, § 125.1 *et seq.* (Stat Ann 1952 Rev § 3.540[1] *et seq.*). See, also, CL 1948, § 319.1 (Stat Ann 1951 Rev § 13.139[1]). In the administration of our zoning laws, while we seek to protect our homes, we must likewise take into account the public interest in the encouragement of full employment and vigorous industry.

This Court, however, has no intention of placing the present or future residents of Paris township at the mercy of this plaintiff. While we direct the court below to reverse its judgments and decree so as to permit the extraction and commercial use of this gypsum deposit, we expressly require that the court's judgments and decree be so drawn as to condition plaintiff's right to mine and manufacture upon performance of the representations as to construction, machinery, methods and results which it has made and to which we have previously referred.

In the interest of careful supervision of the carrying out of plaintiff's representations concerning its mining operations, we further require that said decree reserve to the chancellor the right of any amendment of its terms which may be suggested by future petition and testimony concerning conditions as they actually develop.*

Plaintiff must proceed in the face of the possibility of losing its right to operate in the event that the basic representations which it has made are not performed. Under the circumstances involved, the costs of developing this industry as a good neighbor to Paris township should be a part of the cost of exploitation of this gypsum deposit.

---

* For an interesting example of the use of equity powers to abate harm from a mining and smelting operation, see *Georgia* v. *Tennessee Copper Co.*, 206 US 230 (27 S Ct 618, 51 L ed 1038, 11 Ann Cas 488); 237 US 474 (35 S Ct 631, 59 L ed 1054); 237 US 678 (35 S Ct 752, 59 L ed 1173); 240 US 650 (36 S Ct 465, 60 L ed 846), and the discussion thereof in Mr. Justice BLACK'S opinion in this case.

The judgments and the decree of the court below should be reversed and remanded with instruction for the entry of judgments and a decree in conformity with this opinion. No costs, public questions being involved.

CARR, J., concurred with EDWARDS, J.

KELLY, J., concurred in the result.

BLACK, J. (*concurring in part and dissenting in part*). We are late with determination of these cases. The interim concern voiced in *Township of Bloomfield* v. *Beardslee,* 349 Mich 296, 310, and the far-reaching effect of zoning doctrines the appellee township presses upon us, have forced continuance of our deliberations from conference to conference through 1957 and on into 1958. It is now time to cut through the maze of conflicting and gypsum-dusty contentions, and the perplexing uncertainties of proof and counterproof having to do with corporate prediction and municipal alarm, to what is known among brief writers as the jugular of the case. That I shall treat in division "Second" hereof.

*First: As to the Law Case.*

Much has been written in these cases, in the court below as well as here, mostly of necessity considering what is above and what is below the surface of Paris township and the warring uses that are proffered for judicial choice. In these circumstances my own observations with respect to the scrutinized ordinance are due for sharp abridgment.

As an ordinance enacted pursuant to our township rural zoning act projects its regulatory tentacles toward nether regions, the proponent side of the "debatable question" is progressively weakened and the contestant voice is correspondingly strengthened. This I think was made clear by the

warning rule of *City of North Muskegon* v. *Miller,* 249 Mich 52, 57.* To sustain the ordinance in such case there must be some dire need which, if denied the ordained protection, will result in "very serious consequences." So, and if the ordinance in its proposed application to mining fails to meet the test quoted in the footnote, the result must be a judicial determination of constitutional unreasonableness.

On these premises I agree that the ordinance in question does not, by itself, validly prohibit the necessarily combined mining and manufacturing project plaintiffs would have us approve. My conviction in such regard stems principally from the evidence, photographic and otherwise, showing that present use of this area of Paris township is devoted in approximate entirety to scattered light industry and agriculture and that plaintiffs' planned operations will cause no serious consequences if—and the "if" is a big one—those operations are carried on consistent with confident asseverations that are made here. I turn now to the latter.

*Second: As to the Chancery Case.*

Mr. Justice EDWARDS would direct entry of a declaratory decree authorizing plaintiffs to proceed with the mining and manufacturing of gypsum, beneath and on the surface as sought by them, subject to decretal provisions outlined in the conclusion of his opinion. Holding as I do that the case is not ready for declaratory relief at this time, I cannot join. Here we have no mere zoning case. Its impact without doubt will be felt for years to come in great areas of Michigan where zoning is as yet unknown. We are confronted actually with a bill to obtain

---

* "The courts have particularly stressed the importance of not destroying or withholding the right to secure oil, gravel, or mineral from one's property, through zoning ordinances, unless some very serious consequences will follow therefrom. *(Village of Terrace Park* v. *Errett* [CCA], 12 F2d 240)."

advance approval of that which may or may not, depending upon the future and the effectiveness of equity's process, become an enjoinable public nuisance. Standing as this case does on the edge of great and yet not fully explored vistas of equity jurisdiction to control and suppress threats upon man's right of comfortable habitation, we must proceed with the greatest caution, utilizing "the inestimably valuable flexibility and capacity for growth and adaption to newly emerging problems which the principles of equity have supplied in our legal system." (Frank, J., in *Bereslavsky* v. *Caffey* [CCA], 161 F2d 499, 500.) So, the mentioned ordinance having been eliminated as a decisive factor,* it seems to me that attention should now be concentrated on the real issue of the case; an issue not as yet framed below (there is no cross bill or appeal for equitable protection other than on strength of the ordinance) or fully tried to the chancellor. That issue is the nature and scope of protective relief to which the inhabitants of Paris township are entitled, in this declaratory proceeding, as against the feared threat upon their rights. Such rights were defined generally in *Edwards* v. *Allouez Mining Co.*, 38 Mich 46, 50, 51 (31 Am Rep 301), per COOLEY, J., as follows:

"What is the irreparable injury which is done or threatened in this case? We can see very plainly what it is in the case of many nuisances, and the equity of this particular remedy is then very manifest. If one man creates intolerable smells near his neighbor's homestead, or by excavations threat-

---

* Solely in respect to our determination that the ordinance does not of itself prohibit mining and manufacturing of gypsum as sought by plaintiffs' first application to the township board. Plaintiffs' right to reapply, in the light of such determination, for the desired 750-foot extension of the industrial zone, and the right of local authority to hear and grant or deny such new application, should remain intact.

ens to undermine his house, or cuts off his access to the street by buildings or ditches, or in any other way destroys the comfortable, peaceful and quiet occupation of his homestead, he injures him irrevocably. No man holds the comfort of his home for sale, and no man is willing to accept in lieu of it an award of damages. If equity could not enjoin such a nuisance the writ ought to be dispensed with altogether, and the doctrine of irreparable mischief might be dismissed as meaningless."

This declaratory proceeding fairly calls for warning, conveyed by way of remand with directions, that plaintiffs may proceed solely at their own risk and under the steady judicial surveillance of interim orders and decrees. Otherwise, considering known strength of the *fait accompli* and the 9-point rule of possession, we of the chancellery are apt to generate additional trouble here as well as in Paris township. Once the enormous expenditures contemplated by plaintiffs have been made, and once the mining and manufacturing operation contemplated by their bill is under way without prior safeguards, equity is likely to experience that difficulty her chancellors invariably face when the given operation is a going fact and the natural cry is raised that those who seek injunctive process against nuisance—if any—are out to destroy industry, production, jobs and wages. This we can avoid in this exceptional case. I think for the good of all we should fully utilize its special advantage; that we should firmly provide that the chancellor fix all stakes and odds before bets are made.

Here, in circumstances of promissory testimony and grim controversy, this Court is asked to approve, beforehand, that which all readers of this 900-page record must recognize as being an out-and-out experiment. The question is: Which of the respective contending parties should assume the risk of failure,

should any failure take place? We do not expect failure, yet we should provide now for that unhappy event should it occur. Let me summarize the principal promises it is said we should accept now in lieu of supervised and ultimately proven performance:

A. It is said that plaintiffs' blasting operations, to be carried on underground in furtherance of gypsum mining as proposed, can and will be conducted by means of what is known as the millisecond method of "shooting," the feature of which is that of setting off a number of small distinguished from heavy charges, separated by "delays." According to plaintiffs' expert witnesses "millisecond shooting" reduces substantially the shock which is ordinarily felt at the surface in nearby areas.

B. Plaintiffs' experts say that by a new method of dust control—known as electrostatic precipitation, —99% of the gypsum dust created by the intended operations will be retained on the actual premises of process* and that no dust nuisance will result.

C. As to the fear of township authorities that the intended mining operation will cause serious if not disastrous subsidence of land surfaces in the vicinity thereof, plaintiffs represent with considerable vigor that modern methods of mining, which they are willing to pursue, will provide due guarantee against any such danger.

The foregoing are salient concerns to which supplemental pleadings and additional testimony (as needed) should be devoted on remand for rightful declaratory determination. That the residents of Paris township are entitled to the vigilant protec-

---

* That indeed may not be enough, as Judge Searl pointed out in his thorough and painstaking opinion. Even so, it furnishes evidence that plaintiffs are ready to guarantee, as they should, that no gypsum dust will settle on Mrs. Jones' piano, in the present and prospective residential portions of Paris township, as a result of their intended operations.

tion of equity in above regard is apparent.   That plaintiffs should be told now that theirs is the risk, theirs the continuing burden of making good the representations of their expert witnesses, becomes a matter of judicial duty.   In fact, and prior to commencement of the project as sought in their bill, I would have the chancellor admonish these plaintiffs much as was done a half century ago in the historic and ultimately prosperous *Ducktown Cases:* Go ahead with the promised remedial processes, yet be ready to suffer, should your remedies fail, injunctive cessation of that which we reserve the right to find has become or remains an enjoinable nuisance.

. The *Ducktown* litigation started with *Madison v. Ducktown Sulphur, Copper & Iron Co.,* 113 Tenn 331 (83 SW 658).   It went on to successive decrees of the supreme court as shown in *Georgia* v. *Tennessee Copper Co.,* 206 US 230 (27 S Ct 618, 51 L ed 1038, 11 Ann Cas 488); 237 US 474 (35 S Ct 631, 59 L ed 1054); 237 US 678 (35 S Ct 752, 59 L ed 1173); 240 US 650 (36 S Ct 465, 60 L ed 846).   The steady pressure of judicial inspection and supervision by successive decrees finally resulted in that which originally was thought unattainable; the mutually satisfactory elimination of airborne fumes rising from the smelteries of copper mining which fumes, theretofore, had ravaged crops and vegetation in the limited area where Georgia, Tennessee and North Carolina meet together.*

### Summary

The critical problem in this case arises because of our inability to peer into the future, and to predict the effect of what are asserted to be new and improved methods of dust, blast and subsidence con-

---

* For a description of the tribulations and final satisfactory outcome of this *Ducktown* litigation, see chapter 6 of David E. Lilienthal's "TVA—Democracy On The March" (Harper & Brothers, 1944).

trol. Here is the background of the writer's present caution:

Not far from this area of Paris township there is another mine and plant operated by plaintiffs for the same purposes. There is no doubt that such operation has resulted in a blighted area. With this vivid and daily reminder of what can be seen and felt, the defendants vigorously oppose similar operations. The plaintiffs, however, reply that this time things will be different; dust will be eliminated, blasting will be properly controlled, and there will be no subsidence of land. Yet the chancellor remained unconvinced and the effect of his action was to restrain any start of the project, on condition or otherwise.

Are the plaintiffs right? Considering their asserted willingness to lend every effort to the elimination of that which is assertedly threatened by such operations (and certainly experienced nearby), is elimination feasible as a practical matter? The judicial answer should, I think, be postponed until performance distinguished from promise is proven to the chancellor's satisfaction.

The first case brought here, known below as law action No. 43,556, should be reversed with remand for entry of judgment in favor of plaintiffs and against defendants. The second case brought here, known below as chancery case No. 57,706, should be remanded for the framing and hearing of declaratory issues having to do with defendants' right to equitable supervision and control of this mining and manufacturing project so that performance of plaintiffs' representations is fairly assured; for the taking of such additional testimony as may to the chancellor appear requisite to such continuing supervision; for utilization at expense of plaintiffs of the services as needed of a circuit court commissioner and other arms of court, and for the entry of such

interlocutory decrees pending final determination of the case as may be indicated in the court below.

The declaratory decree, as entered, should be reversed with remand for further proceedings, all in pursuance of the practice shown in *Georgia* v. *Tennessee Copper Co.*, *supra*; and in *Arizona Copper Company, Limited*, v. *Gillespie*, 230 US 46 (33 S Ct 1004, 57 L ed 1384); and *Swetland* v. *Curtiss Airports Corp.* (CCA), 41 F2d 929.* No costs should be allowed.

DETHMERS, C. J., and SMITH, and VOELKER, JJ., concurred with BLACK, J.

KAVANAGH, J., took no part in the decision of this case.

* See 66 CJS, Nuisances, § 132, p 936, "Allowing case to stand without final decree; reserving right to renew."