The **FRANCE STONE COMPANY, INC.,**
an Ohio Corporation, Plaintiff,

v.

**CHARTER TOWNSHIP OF MONROE, a**
**Michigan Municipal Corporation,**
**Defendant.**

No. 90–CV–73409–DT.

United States District Court,
E.D. Michigan, S.D.

Aug. 31, 1992.

James E. Wynne, Butzel Long, Detroit, Mich., for plaintiff.

M. Francis Ortiz, Charles T. Harris, Dickinson, Wright, Moon, Van Dusen & Freeman, Detroit, Mich., for defendant.

## OPINION

GADOLA, District Judge.

### Background

Plaintiff France Stone Company owns 200.92 acres of land, all of which abut a federal and state trunk line highway known as US–24, which is also known as Telegraph Road, in Monroe Township, Monroe County, Michigan. This property is known as the "Denniston Farm".

There exists at this site approximately 46,000,000 tons of minable dolomite[1] after taking into account non-minable areas on the property intended by plaintiff to be used for setbacks, roads, berms, et cetera. The 46,000,000 tons of minable dolomite meet all the road building specifications of the Michigan Department of Transportation.

The property is less than two miles from plaintiff's existing dolomite quarry on Dunbar Road. The Dunbar quarry has been in profitable operation continuously since 1906. Sales from the Dunbar quarry have historically totalled 1.0 to 1.1 million tons per year in modern times, and such sales have consistently resulted in an operating profit for decades. Anticipated sales of dolomite from the Denniston Farms property would be approximately equivalent to those obtained from the Dunbar quarry. It satisfactorily appears that the Dunbar quarry will exhaust its dolomite this year and will then be closed.

Monroe Township is located in central Monroe County, just south and west of the City of Monroe. The township includes residential, agricultural, commercial and industrial land uses.

The Denniston Farm is presently zoned for agricultural use, and is actively farmed. The property is bounded by land zoned for residential and agricultural use.

In 1985 plaintiff sought rezoning of the Denniston Farm from "agricultural" to "heavy industrial", in order to establish a quarry for the mining of dolomite. Under the township's zoning ordinance, mining (operation of a quarry) can only be undertaken on land which is zoned "heavy industrial" (H.I.) and even in an H.I.-zoned district, the quarry can only operate as a "special approved use". Thus, under the zoning ordinance of the defendant, Township of Monroe, plaintiff is required to, first of all, obtain a rezoning from "agricultural" to "heavy industrial", and then in addition obtain a permit from the township board allowing the operation of a quarry on the "heavy industrial" zoned land, as a "special approved use" thereon.

To support its application to rezone the Denniston Farm, plaintiff in 1987 completed and submitted an Environmental Impact Statement (EIS) containing assertions as to why, in plaintiff's estimation, the proposed quarry would cause no very serious consequences to the township. The township's consultant reviewed the EIS and recommended that the application be denied.

---

1. Dolomite stone is a natural resource which, when quarried, crushed and processed, is highly useful as a construction aggregate, including usefulness as an aggregate in highway construction.

After conducting hearings, in March 1990 the defendant township's Planning Commission recommended to the Township Board that plaintiff's rezoning request be denied. The Monroe County Planning Department also recommended to the Township Board that plaintiff's rezoning request be denied.

In April 1990, following hearings, the Monroe Township Board denied plaintiff's rezoning request. Following denial of plaintiff's rezoning request, this litigation followed, in which plaintiff claims (1) that defendant's failure to grant plaintiff's request for rezoning its property to permit the extraction of natural resources constitutes a denial of substantive due process under Michigan law and (2) that defendant's failure to prevent the rezoning has resulted in either a temporary or a permanent taking of plaintiff's mineral rights, entitling plaintiff to recover damages.

This court has previously, in granting plaintiff's motion for a partial summary judgment, determined that the mineral deposits of dolomite on plaintiff's land constitute a valuable natural resource.

A non-jury trial of the remaining issues herein has been conducted by the court and the court now issues this opinion to resolve the issues tried herein.

## I. PLAINTIFF'S CLAIM THAT DEFENDANT'S FAILURE TO GRANT PLAINTIFF'S REQUEST FOR REZONING ITS PROPERTY TO PERMIT THE EXTRACTION OF NATURAL RESOURCES CONSTITUTES A DENIAL OF SUBSTANTIVE DUE PROCESS UNDER MICHIGAN LAW.

### A.

#### Applicable Law

Under settled Michigan law, in the ordinary case of making a successful challenge to the validity of a zoning ordinance, the plaintiff has the burden of proving either firstly that there is no reasonable governmental interest being advanced by the zoning classification itself, or, secondly, that the ordinance is unreasonable because of the purely arbitrary, capricious and unfounded exclusion of other types of legitimate land use from the area in question. *Ed Zaagman, Inc. v. Kentwood*, 406 Mich. 137, 153–154, 277 N.W.2d 475 (1979); *Kropf v. Sterling Heights*, 391 Mich. 139, 158, 215 N.W.2d 179 (1974); *Kirk v. Tyrone Township*, 398 Mich. 429, 247 N.W.2d 848 (1976).

In such ordinary cases of challenges to zoning ordinances, the courts of the State of Michigan have enunciated four rules for applying the above-stated principles, set forth in, among other decisions, *Ed Zaagman, Inc. v. Kentwood, supra*, 406 Mich. at 153–154, 277 N.W.2d 475; *Kropf v. Sterling Heights, supra*, 391 Mich. at 175, 215 N.W.2d 179 and *Kirk v. Tyrone Township, supra:*

1. The ordinance is presumed to be reasonable and valid. *Kropf v. Sterling Heights, supra*, 391 Mich. at 162, 215 N.W.2d 179, quoting from *Brae Burn, Inc. v. Bloomfield Hills*, 350 Mich. 425, 86 N.W.2d 166 (1957).

2. The party attacking the ordinance has the burden of proving affirmatively that the ordinance is an arbitrary and unreasonable restriction upon the owner's use of his property.—it must appear that the clause attacked is an arbitrary fiat, a whimsical "ipse dixit", and that there is no room for a legitimate difference of opinion concerning its reasonableness. *Kropf v. Sterling Heights, supra*, 391 Mich. at 162, 215 N.W.2d 179.

3. To sustain an attack on a zoning ordinance, under the Michigan view, an aggrieved property owner must show that if the ordinance is in force the consequent restrictions on his property preclude its use for any purpose to which it is reasonably adapted. *Kropf v. Sterling Heights, supra*, 162–163, 215 N.W.2d 179.

4. Considerable weight will be given to the findings of the trial judge. *Kropf v. Sterling Heights, supra*, 163, 215 N.W.2d 179, quoting *Christine Building Co. v. City of Troy*, 367 Mich. 508, 518, 116 N.W.2d 816 (1962); *Kirk v.*

*Tyrone Township, supra,* 398 Mich. at 439–440, 247 N.W.2d 848.

In this litigation, however, it is clear that an entirely different standard and rules regarding the validity of a zoning ordinance are applicable. The Michigan Supreme Court has decisively opined and ruled that a zoning regulation which would prevent the extraction of valuable natural resources is invalid unless "very serious consequences" will result from the proposed extraction.

*Silva v. Ada Township,* 416 Mich. 153, 156, 330 N.W.2d 663 (1982):

"We reaffirm the rule of *Certain-teed Products Corp. v. Paris Township,* 351 Mich. 434, 88 N.W.2d 705 (1958), that zoning regulations which prevent the extraction of natural resources are invalid unless 'very serious consequences will result from the proposed extraction'". *Silva,* at 160, 330 N.W.2d 663:

"As the United States Court of Appeals for the Sixth Circuit said in *Village of Terrace Park v. Errett,* 12 F.2d 240, 243 (6th Cir.1926):

'There is—a substantial difference between an ordinance prohibiting manufacturing or commercial business in a residential district that may be conducted in another locality with equal profit and advantage, and an ordinance that wholly deprives the owner of land of its valuable mineral content.' "

In the *Silva* decision, the court reaffirmed the doctrine that zoning ordinances are presumed to be reasonable, and that a person challenging the ordinance has the burden of proving otherwise. *Silva, supra,* 158, 330 N.W.2d 663, citing *Kropf, supra,* 391 Mich. at 158, 215 N.W.2d 179, and *Ed Zaagman, Inc. v. Kentwood, supra,* 406 Mich. at 157, 277 N.W.2d 475. The *Silva* court then, however, went on to promulgate a decidedly different standard to be applied when enforcement of a zoning ordinance would prevent the extraction of natural resources. That standard, as set forth at pages 158–161 of 416 Mich., 330 N.W.2d 663 of *Silva,* is as follows:

"Zoning regulations seek to achieve a land use which serves the interest of the community as a whole. Because of the important public interest in extracting and using natural resources, this court has applied a more rigorous standard of reasonableness when the zoning would prevent the extraction of natural resources.

This court first noted that zoning which prevents the extraction of natural resources involves different considerations than zoning regulations generally in *North Muskegon v. Miller,* 249 Mich. 52, 57, 227 NW 743 (1929), which concerned a zoning ordinance preventing the drilling of oil wells:

'The courts have particularly stressed the importance of not destroying or withholding the right to secure oil, gravel or mineral from one's property, through zoning ordinances, unless some *very serious consequences* will follow therefrom. (emphasis supplied)'

In *Certain-teed Products Corp. v. Paris Township,* 351 Mich. 434, 467 [88 N.W.2d 705], this court reaffirmed that zoning would not be sustained unless very serious consequences would result from the mining operations:

'To sustain the ordinance in such case there must be some dire need which, if denied the ordained protection, will result in very serious consequences'.

We again reaffirm the 'very serious consequences' of *Miller* and *Certain-teed.*

Natural resources can only be extracted from the place where they are located and found. Preventing the mining of natural resources located at a particular site prevents all use of those natural resources—.

Preventing the extraction of natural resources harms the interests of the public as well as those of the property owner by making natural resources more expensive. Because the cost of transporting some natural resources (e.g., gravel) may be a significant factor, locally obtained resources may be less expensive than those which must be transported long distances. It appears that the silica sand

involved in one of the cases here on appeal is unique in quality and location.

In most cases, where natural resources are found, the land will be suited for some other use and can reasonably be devoted to that use. Unless a higher standard is required, natural resources could be extracted only with the consent of local authorities or in the rare case where the land cannot be reasonably used in some other manner. The public interest of the citizens of this state who do not reside in the community where natural resources are located in the development and use of natural resources requires closer scrutiny of local zoning regulations which prevent development. In this connection, we note that extraction of natural resources is frequently a temporary use of the land and that the land can often be restored for other uses and appropriate assurances with adequate security can properly be demanded as a precondition to the commencement of extraction operations."

The *Silva* court continued at page 162 of 416 Mich., 330 N.W.2d 663:

"Our reaffirmance of the 'very serious consequences' rule does not imply that zoning which prevents the extraction of natural resources is unreasonable. Zoning regulations are presumed to be reasonable and a person challenging zoning has the burden of proving otherwise. The party challenging the zoning has the burden of showing that there are valuable natural resources and that no 'very serious consequences' would result from the extraction of those resources."

■ Thus, under Michigan law, which this court must apply in determining the validity of a zoning ordinance which prevents a landowner from extracting minerals from his land, the landowner has the burden of proving:

1. That the mineral which is sought to be extracted is a *valuable natural resource,* and
2. The extraction *will cause no very serious consequences.* (emphasis supplied) *Silva, supra,* 416 Mich. at 162, 330 N.W.2d 663. See also *Compton*

*Gravel v. Dryden Township,* 125 Mich. App. 383, 336 N.W.2d 810 (1983).

As to the first requirement, Michigan case law provides that "(t)he proper focus in determining whether the natural resource is *valuable* (emphasis supplied) is on whether the landowner, by extracting the resource, can receive revenues and reasonably hope to operate at a personal profit." *American Aggregates Corp. v. Highland Township,* 151 Mich.App. 37, 41–42, 390 N.W.2d 192 (1986).

■ As this court has previously ruled, in granting plaintiff's motion for a partial summary judgment herein, it is beyond doubt that the dolomite deposits beneath the Denniston Farm site are "valuable natural resources". Michigan courts have repeatedly so found when presented with the question of determining whether deposits of sand and gravel are such "valuable natural resources". See e.g. *Bloomfield Township v. Beardslee,* 349 Mich. 296, 310, 84 N.W.2d 537 (1957); *North Muskegon v. Miller,* 249 Mich. 52, 57, 227 N.W. 743 (1929); *American Aggregates Corp. v. Highland Township,* 151 Mich.App. 37, 42, 390 N.W.2d 192 (1986); *Silva v. Ada Township,* 124 Mich.App. 77, 79, 333 N.W.2d 584 (1983), remand from 416 Mich. 153, 330 N.W.2d 663 (1982).

Further, the evidence in this case is clear that the plaintiff herein can, by extracting the stone at the Denniston Farm site, both raise substantial revenues and reasonably anticipate receiving profits.

This court therefore reasserts and reaffirms its prior ruling herein that the deposits of dolomite which plaintiff seeks to mine are indeed a "valuable natural resource".

This then leaves the plaintiff with the burden of establishing that the proposed mining operations to extract the dolomite will result in no "very serious consequences".

The Michigan Court of Appeals has held that in determining whether the proposed extraction of mineral deposits will result in "very serious consequences" to the township and its residents, the court must weigh the degree of public interest in the

extraction of a landowner's specific natural resource as a matter to be considered, not in the context of determining whether the natural resource is "valuable" but rather in determining whether "very serious consequences" to the community will be caused by the mining operation. Thus, in the view of the Michigan Court of Appeals, even after the natural resource has been determined to be "valuable" (as it has been determined to be by the prior partial summary judgment herein), nevertheless the court must revisit, in effect, the value of the resource in determining whether "very serious consequences" will result from the extractive process, by adopting a "sliding scale approach" whereby if the public interest in the natural resource is very high, then the plaintiff's burden of proof in establishing that there will be no "very serious consequences" is lessened, and, conversely, if public interest in the extraction of the natural resource is low, then, despite the fact that the natural resource is "valuable", the plaintiff will be required to bear a greater burden in establishing that there will be no "very serious consequences" from its contemplated operations. Put another way, the higher the public interest in the landowner's mineral deposits, then the consequences of the mining will not reach the level of "very serious" as readily as in the situation where the level of public interest in the mineral deposits is lower. This doctrine was adopted by the decision of the Michigan Court of Appeals in *American Aggregates Corp. v. Highland Township, supra,* in which the court held, at pages 42–46 of 151 Mich.App., 390 N.W.2d 192 as follows:

> "Prior to reaching his conclusion that plaintiff had failed to show that these four consequences did not constitute 'very serious consequences' to the community, the trial judge made several findings indicating that plaintiff had failed to establish that southeastern Michigan needed another sand and gravel extraction operation. Plaintiff argues that the evidence admitted on this issue, and the trial judge's conclusion, are irrelevant in assessing whether 'very serious consequences' would result from plaintiff's

mining operations under the *Silva* analysis. We disagree.

In reaching our conclusion on this issue we first note that in *Silva* the Supreme Court did not determine whether 'very serious consequences' would result from the extraction of sand and gravel from plaintiff's land in that case. The Court merely remanded the case to this Court for application of the 'very serious consequences' analysis. In *Silva,* the Supreme Court did not specifically address whether the need for sand and gravel on plaintiff landowner's land was a relevant factor in the analysis. However, the entire foundation of the stricter test of reasonableness referred to in *Silva* rests on the important public interest involved in extracting and using natural resources. Therefore, the degree and extent of public interest in the extraction of the specific natural resources located on the landowner's land is a relevant factor in reviewing the reasonableness of the zoning regulation.

This factor is relevant because the degree of public interest in natural resources varies greatly depending on the type of resource involved and on the market demand and supply conditions that exist as to the resource sought to be extracted. We do not believe that the *Silva* analysis requires us to blindly assume that all 'valuable' natural resources involve a constant high degree of public interest. For example, certainly a sand and gravel extraction operation in an area where no adequate supply of sand and gravel currently exists for necessary construction activity involves a higher degree of public interest than would a sand and gravel operation located in an area where there was an ample supply of sand and gravel or where there was little construction activity. Although an added extraction operation in the latter area might reduce the price of sand and gravel, the public interest is less in such an operation than in the former area where there is a strong public need for an available source of supply for sand and gravel.

The problem presented in recognizing the degree of public interest in the extraction of a landowner's specific natural resource as a relevant factor is where to fit this factor into the *Silva* analysis. As indicated, we do not believe that this factor should be considered in determining whether the natural resource is 'valuable'. However, we believe that the degree of public interest in the landowner's specific natural resource should be considered when analyzing whether 'very serious consequences' to the community will result from the extraction of the natural resource. This will result in a sliding scale determination of whether 'very serious consequences' exist in the landowner's specific situation. If public interest in the specific landowner's resource is very high, the consequences resulting from the extraction of the resource will not reach the level of 'very serious' as readily as in the case where public interest in the specific resource is relatively low.

This type of sliding scale approach based on the public interest in the landowner's specific resource results in an appropriate cost/benefit analysis in applying the *Silva* standard for determining the reasonableness of zoning regulations preventing the extraction of natural resources. The 'very serious consequences' test is not viable unless it is applied in this way, since it essentially involves an internalizing of costs imposed on the public by the extraction operation that the landowner is not aware of in making his private decision to extract the resources (externalities). For such an internalizing of public costs to make any sense, these costs must be compared to the benefits of the extraction operation as measured by the degree of public interest in the specific resources. As stated above, if the benefits (public interest in the resources) are low, less public costs (consequences) are necessary to outweigh those benefits and lead to a conclusion that the zoning regulation preventing extraction is reasonable. Therefore, if public interest in plaintiff landowner's resources is relatively low, plaintiff must make a very strong showing that no 'very serious consequences' will result from the extraction of the resources.

In *Compton Sand & Gravel Co v Dryden Twp.* this Court effectively adopted the logical cost/benefit analysis approach to the *Silva* test discussed above. In *Compton Gravel*, this Court affirmed a circuit court decision, made just prior to the *Silva* decision, that a zoning regulation preventing the extraction of gravel was reasonable. This Court specifically found that the circuit court's approach in making its determination would be appropriate under *Silva* and described the circuit court's reasoning as follows:

> After weighing the interests of plaintiff and the general public in the extraction of gravel from plaintiff's proposed gravel pit against the interests of the general public, the intervening defendants and the defendant township and its residents in their general health, welfare and safety, the circuit court determined that the defendant township properly found that a balancing of these interests required the denial of plaintiff's application for a gravel mining permit.
>
> The circuit court, in dismissing the complaint, determined that competent, material and substantial evidence supported the township board's decision, finding that the detriment to the people in the area outweighed the benefit of removing the gravel for the benefit of the public at large. (*Compton Gravel, supra* [125 Mich.App. at], p 394 [336 N.W.2d 810].)"

Plaintiff herein vigorously disputes the adoption and application by this court of this "sliding scale approach" which has not, at this time, been expressly affirmed or adopted by the Michigan Supreme Court. Plaintiff has asserted that *American Aggregates* is neither binding nor persuasive. However, where a state's highest court has not addressed an issue, a federal court sitting in exercise of diversity jurisdiction must draw from "decisional law of the state's lower courts" (among other

sources) to determine what the highest court would decide. *Monette v. AM–7–7 Baking Co., Ltd.*, 929 F.2d 276, 280 (6th Cir.1991); *Grantham & Mann v. American Safety Products, Inc.*, 831 F.2d 596, 608 (6th Cir.1987)).

■ While the *Silva* decision of the Michigan Supreme Court did terminate the prior "arbitrary and capricious test" as to the validity of zoning ordinances in cases of proposed extraction of natural resources, in favor of a test requiring the landowner to establish, first, that he proposed to extract a "valuable natural resource" and, secondly, that "no very serious consequences" would result from the extraction, the Supreme Court did not instruct the trial court on remand as to how it should apply the test. *American Aggregates, supra* 151 Mich.App. at 43, 390 N.W.2d 192.

This court, unless it is convinced by "persuasive data" that the Michigan Supreme Court would decide otherwise, must not disregard *American Aggregates*, the most directly applicable Michigan Appellate Court decision on the standards to be used in determining whether "very serious consequences" will result from plaintiff's proposed mining operations. *Monette, supra*, at 280–281; *Itrich v. Huron Cement Division of National Gypsum Co.*, 670 F.Supp. 199, 202 (E.D.Mich.1987) (citing *West v. AT & T Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)).

Therefore, despite any reservations this court may have regarding whether the "sliding scale approach" utilized by the Michigan Court of Appeals in *American Aggregates* to implement the *Silva* decision was the appropriate approach, the court will follow the *American Aggregates* ruling in determining whether plaintiff has established that no "very serious consequences" will result to Monroe Township and its residents by reason of plaintiff's proposed quarry operation.

■ The remaining issue in this litigation is whether the establishment and operation of plaintiff's proposed dolomite quarry will cause "very serious consequences" to the defendant township and its residents. On this issue, as hereinabove stated, plaintiff has the burden of proof on the proposition that no "very serious consequences" will result.

The contentions of the defendant township are that "very serious consequences" will result to the township in several categories:

1. The quarry would depress existing property values and diminish the attractiveness of undeveloped property surrounding the proposed quarry, and would deter persons who were contemplating purchasing property in the area, thereby resulting in diminution of the township's tax base, and would also diminish the value of existing residential structures in the area of the proposed quarry.

2. The Denniston Farm quarry, when depleted, would result "in another huge hole in the ground" thereby permanently scarring the township.

3. There would be excessive noise, from quarry operations and trucks, and undesirable air emissions (dust) and air pollution.

4. There would be dangerous conditions created on US–24 (Telegraph Road), by large quarry trucks entering and leaving the quarry.

5. Dewatering of the quarry may cause a decrease in the quality and quantity of local residents' water wells, flooding of a swale which runs across Denniston Farm, and a drawing of ground water into the quarry, which then must be pumped to the surface and discharged, all of which would have an adverse impact on wells, water tables, and water flow in the township.

6. The quarry would interfere with defendant's plan for development of the township. The master plan of the township calls for the frontage on Telegraph Road, in the area of the entrance to the proposed quarry, to be zoned for commercial use. The township maintains that to put a "heavy industrial" zoning on the Denniston Farm property, and to have a stone quarry established on the site, would destroy the viability of the Telegraph

Road frontage for commercial purposes, such as a possible K–Mart store, or a Walmart store or a Sears Roebuck store and similar commercial activities.

It is the position of the township that there is a relatively low public interest in the extraction of plaintiff's natural resource of dolomite, in that there are various other stone quarries in Monroe County containing adequate reserves of stone, sand and gravel. Therefore, so defendant contends, the "sliding scale approach" militates that less costs (consequences) to the public are necessary to outweigh the public interest in the resources and this leads to a conclusion that the zoning regulations preventing mining are reasonable and valid.

If any of the consequences alleged by the township to result from the mining are found to be likely to result from the mining, and if any one or more of those consequences are deemed to be "very serious consequences" under the aforesaid "sliding scale approach", then plaintiff would fail to sustain its burden of proof.

### B.

*Findings of Fact*

1. The Denniston Farm site is eminently suitable for the establishment of a quarry for the mining of dolomite. Among the factors which justify this conclusion are the following:

   a. The stone is of very high quality, being from the highly desirable Bass Island stone formation, and meets the specifications and requirements of the Michigan Department of Transportation for aggregate used in highway construction. Most stone, sand and gravel from other quarries in the Monroe County area does not meet those Michigan Department of Transportation specifications for highway construction.

   b. The proposed quarry would be located on a main trunk line highway, US–24 (Telegraph Road).

   c. The quarry can be operated within setback requirements of the township.

   d. There is a low "overburden", meaning that the layer of dirt and sand over the stone is relatively thin, thereby reducing the difficulty and cost of reaching the valuable stone.

   e. Testimony has established that the Bass Island dolomite, the material on this site, is the only high quality aggregate available in Monroe County, and that the reserves of this natural resource at the Denniston Farm are superior to other reserves throughout Monroe County. The stone available at other county sites is much softer and does not generally meet Michigan Department of Transportation specifications for highway construction.

2. The proofs in this case confirm that unless there is additional zoning granted, by 2005 A.D. or 2010 A.D. all high-quality stone aggregate will be exhausted in Monroe County, although there will be a great need for such aggregate to meet current and future highway construction needs, as well as other demands for such stone. If such stone must be obtained from remote sites, then the cost thereof will rise, due to sharply increased transportation costs.

3. Inevitably, there would be noise and sound emanating from the proposed quarry operations. There will be the necessity of the use of explosives for blasting in order to dislodge rock. Plaintiff's witnesses have testified that not more than two blasts, each lasting less than one second, are contemplated each week, and that there would be no blasting on Saturdays or Sundays. Further, the U.S. Bureau of Mines imposes vibration levels and regulations relating to blasting which the plaintiff would be required to observe in the operation of the proposed quarry.

There are no structures on the land immediately adjacent to the Denniston Farm site. Even if there were such structures later placed on adjoining property, evidence at trial established that there would be no serious or substantial effect on such structures as a result of the infrequent blasting. Expert testimony was to the effect that there would be no adverse physiological effects from the use of such explosives in

blasting upon nearby residents. As to whether there would be any adverse psychological effects, this is only subject to conjecture and speculation. Some persons might claim to suffer from psychological effects from the infrequent blasting, especially if they were strongly opposed to the quarry, while others, especially those not so opposed, would in all probability have no psychological problem with the blasting.

Defendant's own expert on blasting techniques and the effects thereof on nearby residents and properties, has testified that plaintiff's mining operations will not, in his opinion, endanger human health. Further, he testified that in his opinion it was possible for the mining operation to take place and provide safety to the surrounding property and neighborhood. He further stated that "with the assumption that the blasting will take place according to the highest standards of our knowledge of the art at this stage, I don't think there would be very serious consequences."

4. It satisfactorily appears, upon evaluation of conflicting testimony herein, that, from projections of sound to be anticipated from the entire proposed quarrying operation at the Denniston Farm site, quarry operations would be unlikely to cause any adverse noise effects on nearby residences, and would meet all requirements of the township's present noise ordinance.

5. The township has in force a noise ordinance, which of course the plaintiff would be required to observe. Also, the township ordinance regarding operation of quarries provides that hours of operation be limited to a maximum of from 7:00 AM to 5:00 PM from Monday through Friday, from 7:00 AM to 1:00 PM on Saturday (with no blasting allowed on Saturday), and with no operations on Sundays. Plaintiff has represented that it would strictly observe the aforementioned hours of operation.

6. The township requires, under its setback ordinance, a 150 foot setback around the entire perimeter of a quarry, thereby somewhat isolating the quarry from adjoining properties.

7. Inevitably, there would be dewatering of the proposed quarry, which may cause a lowering of the water table, thereby impacting wells of nearby property owners. When a quarry is operating, and water which migrates into the quarry from adjoining land is then continually pumped out to keep the quarry dry, then there would be some continuing dewatering of the aquifer in adjoining land. The plaintiff contemplates installation of a well-monitoring program and systems, involving both 4 on site observation wells and up to 34 off site observation wells (plaintiff's exhibit 15). In the event that a property owner or resident encounters a problem with a well, as a result of plaintiff's quarry dewatering, plaintiff proposes the following sequence of steps to be undertaken immediately, all at plaintiff's sole expense:

A. Lower the pump intake setting in the affected well, or install a different and more effective pump.

B. If A is not effective, drill the well deeper or drill a new well.

C. If B is not effective, connect the property to a municipal water supply.

These proposed solutions are as set forth in plaintiff's exhibits 6 through 16, inclusive.

Plaintiff's expert testified that these measures would be entirely adequate to counteract and overcome any adverse effects of plaintiff's dewatering operations in its quarry. Defendant's expert, on the other hand, testified that he was unable to form an opinion that the plaintiff's dewatering would cause very serious consequences.

The court is satisfied that the dewatering would cease when the quarry is depleted and closed, pumps are shut off, and water in the quarry then rises to the level of the adjacent aquifers. If this is not the case, plaintiff would continue to be responsible to rectify the situation. It satisfactorily appears from evidence in this case that water quality in wells on nearby properties would not be adversely affected by operation of such a quarry. In the unlikely event that this should occur, plaintiff has represented that it would be entirely responsible for rectifying the situation.

8. The Davis Swale, which runs across a portion of the Denniston Farm, would be relocated to some extent in the event the quarry is allowed. It does not appear that the ability or capacity of the swale to handle water runoff, or its capacity for handling storm water, will be adversely affected to any material degree by this relocation or by the quarry operation, and, to the contrary, the flow of storm water through the swale would be decreased by operation of the proposed quarry since the Denniston Farm would then no longer be discharging any storm water into the swale.

9. Plaintiff has committed itself to a "Mining and Reclamation Program", governing installation and operation of the proposed quarry, and reclamation of the site when the proposed quarry is depleted, which is expected to occur in approximately A.D. 2034. This provides for screening in the form of berms, being 10 feet to 30 feet in height, around the perimeter of the proposed quarry, which would be planted with grass and trees, and the provision of appropriate and suitable landscaping to shield the quarry from the view of nearby residents, property owners or future nearby developments. Plaintiff also proposes to beautify the entryway to the quarry. This program is set forth in considerable detail in plaintiff's exhibit 21, consisting of 19 drawings, maps and plans. Implementation of this plan would, so the court finds, minimize any serious adverse affect upon the values and desirability of nearby properties and tax base.

10. It is estimated that operation of a quarry on this site would engender approximately 150 round trips daily by quarry trucks, or a total of 300 truck trips in all, being 150 entries to the quarry and 150 exits therefrom. Plaintiff's traffic engineering consultant has testified that if a shopping center, in contrast, was established on Telegraph Road at or near this site, it might engender 20,000 motor vehicle trips per day, and conversion of the Denniston Farm to an area zoned for single family residences would generate approximately 8,000 trips per day. Defendant has indicated that it is its hope that the Denniston Farm would eventually be developed for commercial use, being a shopping center area, along Telegraph Road, and for residential development of the remainder of the farm. The proposed use of the site for mining of stone would, so plaintiff's expert testified, generate less additional traffic than any use other than leaving the site as agricultural land only. The court finds this testimony compelling and convincing.

11. Plaintiff's consultant has prepared a diagram (plaintiff's exhibit 17) showing proposed access to and from Telegraph Road by the proposed Denniston Farm quarry, which, so plaintiff's consultant asserts, has been reviewed by the Monroe County Road Commission and the Michigan Department of Transportation, neither of which body has indicated any opposition thereto. It is his opinion that the predicted level of truck traffic generated by the proposed quarry should cause no increased hazards even without the road improvements on Telegraph Road at the entry/exit of the quarry proposed by the plaintiff. In any event, even if the quarry is approved, plaintiff will be required to obtain approval from the Michigan Department of Transportation for design of an appropriate entry to and exit from the quarry on Telegraph Road, and for improvements on Telegraph Road, in order to provide adequate features for traffic safety. Plaintiff has introduced a possible design (plaintiff's exhibit 17) which appears to be reasonable and feasible, although the Michigan Department of Transportation will have authority over design of the intersection. Defendant's expert testified, on the other hand, that plaintiff's proposed plan was deficient in that it would cause a hazardous condition when trucks exited from the quarry site and turned left to proceed north on Telegraph Road. He made no such objection regarding trucks exiting and turning right (south on Telegraph) or to trucks entering the quarry site from either the north or the south. The court does not find that there would be any very serious consequences regarding traffic movements or hazards from the operation of the proposed quarry.

12. From the conflicting evidence presented in the trial of this matter regarding the effect of the operation of the proposed quarry upon residential values in the vicinity, this court concludes that there will be very little, if any, differential in values of these properties, compared with the values of other similar properties remote from the quarry, dependent on whether the quarry is established. With regard to plaintiff's present Dunbar Road quarry, there appears to be very little difference in value, if indeed any, between those homes in close proximity to the quarry as contrasted to those distant from the quarry. Insofar as plaintiff's Sylvania, Ohio quarry is concerned, the situation between matched pairs of homes is much the same; in fact, in Sylvania the more valuable homes appear to be those closer to the quarry.

13. Defendant maintains that the proposed quarry would be incompatible with the commercial zoning planned for Telegraph Road in the township's master plan. There was considerable evidence and testimony to the effect, however, that establishment of the quarry, in accordance with plaintiff's plans for berms, landscaping, set backs, improvements at the entryway et al would avoid any incompatibility with the commercial shopping area proposed for the frontage strip on Telegraph Road, behind a portion of which the quarry would be situated.

Further proofs in this case strongly indicate that the township presently has considerable commercially zoned land, with one large shopping center area, and that it is doubtful that this additional commercial zoning is needed, or that the population of the township, present or projected, indicates future need for an additional shopping center along Telegraph Road. The township's master plan calls for the portion of the Denniston Farm which fronts on Telegraph Road, approximately 750 feet deep, to be zoned for commercial purposes with the remainder to remain agricultural.

Plaintiff, from the evidence in this case, has committed itself to refraining from any development for quarry purposes of the portion of its land fronting on Telegraph Road, which frontage is designed on the defendant's master plan for commercial development. This is a strip, as stated, approximately 750 feet deep along Telegraph Road. Thus, even if the quarry is established, with berms, landscaping and screening from the view of Telegraph Road, the Telegraph Road frontage of plaintiff's land would continue to be available for commercial development. Only a very small portion of plaintiff's Denniston Farm fronts on Telegraph Road. The predominant acreage of the Denniston Farm has no frontage whatsoever on Telegraph Road.

14. Insofar as any adverse affect of operation of the proposed quarry on air quality is concerned, plaintiff would be required, in order to operate its quarry equipment, to initially obtain a "Permit to Install" (P.T.I.) such equipment, and later a "Permit to Operate" (P.T.O.) from the Michigan Department of Natural Resources and the Michigan Air Pollution Control Commission. Those bodies have the responsibility to regulate, and to enforce those regulations, in order to protect against any "very serious consequences" to air quality created by commencement of a quarry operation, and it would appear that those regulatory bodies would be adequate to protect the public from any such serious adverse consequences. In any event, it does not appear, from the evidence in this case, that the operation of the quarry at the proposed site will so adversely affect air quality as to cause very serious consequences to the township or its inhabitants.

15. Insofar as the apprehension of the township that the ultimate depletion and closing of the quarry in approximately A.D. 2034 will create a huge and unsightly hole in the township, that apprehension seems to the court to be based entirely on speculation and conjecture. In fact, it does appear that the quarry site, when no longer utilized, has the potential to become a desirable recreational area containing a lake and plaintiff has produced proofs indicating an intention to provide a safety ledge, so as to avoid an abrupt drop-off, which would be a desirable safety feature for creation of the lake as a recreational body of water when the quarry ultimately fills with water.

From the proofs in this case, this court concludes that there will not likely be any very serious consequences 40 or more years in the future when the deposits of dolomite at the site have been exhausted and water enters the quarry site.

The court's findings of fact are, then, based on the evidence produced during trial of the issues herein, as follows:

1. Plaintiff's mineral deposits of dolomite at the Denniston Farm site constitute a valuable natural resource, as previously determined herein and as now reaffirmed.

2. The public interest in the plaintiff's resource of dolomite at the Denniston Farm site is very high.

3. The noise related to the proposed mining operation will not cause the community very serious consequences.

4. Dust or other airborne particles which may originate from the mining operation will not cause the community very serious consequences.

5. Vibrations resulting from the blasting operations will not cause the community very serious consequences.

6. Water impacts in nearby wells, related to the mining operation, will not cause the community very serious consequences, in either water availability or water quality.

7. The presence of the proposed mine will not have a negative impact on the value of real estate so as to cause the community very serious consequences.

8. The truck traffic entering and leaving the quarry site will not cause the community very serious consequences.

9. The operation of the proposed quarry will not impact the township's land planning efforts or tax base in a manner rising to any very serious consequences.

10. The mining operation will not impact the Davis Swale in such manner as to cause the community any very serious consequences.

It may be noted, parenthetically, that while this court has found the public interest in the valuable natural resource to be very high, and therefore that the conse-

quences resulting from the extraction of the resource will not reach the level of "very serious" as readily as in the case where public interest in the resource is relatively low, nevertheless even if this court had found that public interest in the valuable natural resource was not very high, plaintiff's proofs in that event also are sufficient to establish that there will be no "very serious consequences" to the township.

In summary, there will be no "very serious consequences" to the defendant township or its residents, property owners and businesses by reason of the operation of plaintiff's proposed stone quarry at the subject site.

These findings of fact are based on the evidence in this case, including testimony and exhibits in which plaintiff has made representations as to the manner in which plaintiff will conduct its mining operations and develop the site. On the basis of that evidence, this court believes that this potentially important mining and industrial operation can be conducted in Monroe Township consistent with the zoning and development plan of the community. While the court finds that, based on the evidence relating to plaintiff's plans and intentions, there will be no very serious consequences to the township from plaintiff's proposed quarry operations, and while the plaintiff should under these circumstances have the right to develop and exploit the mineral resources on its land, this must be accomplished in such manner as to protect the community in the event that plaintiff later departs from its present plans and stated intentions, or in the event that there are unforeseen future very serious consequences of plaintiff's mining operations.

Therefore, the action of this court in permitting plaintiff to proceed with the development and operation of its stone quarry will be conditioned upon plaintiff's performance of its representations as to construction, excavation, development, planning and operation of the quarry, to which reference has previously been made, with a reservation of jurisdiction by this court to

amend its rulings herein or to enforce by its future orders such terms and provisions as may be necessary for the protection of the community concerning conditions as they may actually develop. Plaintiff must proceed in the face of the possibility of losing its right to operate in the event that the basic representations which it has made are not performed and fulfilled. Under the circumstances here involved, the costs of developing this quarry and operating it as a good neighbor to the Township of Monroe should be a part of the cost of exploitation of these dolomite deposits. *See Certainteed Products v. Paris Township, supra.*

■ Although not necessary to a determination of the issues herein, it also appears that the defendant township may well have attempted to impose an illegal exclusionary zoning system, excluding plaintiff from the possibility of the extraction of its natural resource. Exclusionary zoning occurs when a municipality impermissibly uses its zoning power to prevent a lawful type of land use within its borders. Under Michigan law, it is both unconstitutional and unlawful to exclude a legitimate land use from the borders of a municipality, and a showing of exclusionary zoning destroys the presumption of the zoning's validity. *Kropf v. Sterling Heights, supra.*

The Michigan courts have recognized that even when a zoning ordinance provides for a certain land use, exclusionary zoning still may occur when the practical effect of the ordinance nevertheless excludes that land use from the municipality. *Ottawa Farms v. Polkton Township,* 131 Mich. App. 222, 345 N.W.2d 672 (1983); *Archbishop v. Orchard Lake,* 333 Mich. 389, 53 N.W.2d 308 (1952).

In the township's latest master land use plan, only approximately 160 acres of land have been set aside for "heavy industrial" use, and under the zoning ordinance quarries can be permitted as a "specially approved use" on land zoned "heavy industrial" only. On that particular 160 acre parcel of land it does not appear that there are sufficient resources of stone for a viable stone quarry. Further, the strip of land is only 700 feet in width. With a required 150 foot setback on each side of the strip, the quarry would be limited to only 400 feet in depth which would appear to be insufficient for quarry machinery and trucks, even if there were commercially viable reserves of dolomite thereon, which appears to be dubious. And, as stated, this is the only piece of land upon which a quarry could be located under the township's master plan, even though the area of Monroe Township is a prime depository of sand, rock and gravel. Additionally, the township's chief planner, author of the township's zoning ordinance, testified that no investigation was done before adoption of the township's master land use plan to determine whether there was any stone whatsoever on the only land on which "heavy industrial" zoning is intended, and hence the only land on which approval of a quarry as a specially approved use could be obtained. Further, he testified that people in Monroe Township were "fed up" with stone mining, had "lived with it for 90 years and did not want any more of it." There is, thus, considerable evidence herein that the defendant township adopted a master land use plan which was designed to exclude the mining of stone in the entire township, or which at the least might well achieve such a result, and determined zoning issues so as to achieve such a result. Nevertheless, this court will not determine that issue since there is adequate and compelling evidence, irrespective of the question of possible exclusionary zoning, to support the granting of the relief sought by plaintiff, on the basis that the denial of plaintiff's zoning request constituted a denial to it of substantive due process.

### C.

#### Conclusions of Law

■ Defendant's denial of plaintiff's request for rezoning of its Denniston Farm premises so as to permit development and operation of a stone quarry at the site is unreasonable and constitutes a denial of substantive due process to plaintiff. Hence, the present zoning classification of plaintiff's land, permitting only agricultur-

al use, is invalid as to the specific use contemplated and proposed by plaintiff, i.e. the development and operation of a stone quarry at the site.

### D.
### *Relief*

■ Accordingly, defendant shall be enjoined and restrained from enforcing its zoning ordinance in such manner as to prevent plaintiff from developing and operating its proposed stone quarry on the subject premises. This ruling leaves intact the present agricultural zoning of the subject premises, subject only to plaintiff being permitted the specific right to develop and operate a stone quarry on the site which, in effect, gives to plaintiff the right to develop and operate a stone quarry on the site as a "specially approved use" while retaining the present agricultural zoning, thus preventing the use of the premises for any other "heavy industrial" purpose. This court thus is neither returning this matter to the Township Board for its appropriate action nor is it rezoning the property to the "heavy industrial" classification. The court is not acting as a zoning board. Rather, the court is leaving the present agricultural zoning of the site intact but is enjoining the board from preventing or interfering with plaintiff's extraction of its valuable natural resources from its land. *See Schwartz v. City of Flint*, 426 Mich. 295, 395 N.W.2d 678 (1986).

This injunctive relief will be granted on the following terms and conditions:

A. Plaintiff shall limit its blasting to not more than two blasts weekly, each lasting not more than one second, and with no blasting on Saturdays, Sundays or holidays. Plaintiff shall observe all rules and regulations, all ordinances and statutes, in its blasting operations, including those of the U.S. Bureau of Mines, and other federal, state and local regulatory bodies having jurisdiction.

B. Plaintiff's operation of the quarry shall be limited each week to a maximum of a period from 7:00 AM to 5:00 PM on Monday through Friday, and 7:00 AM to 1:00 PM on Saturday, with no operations on Sundays or holidays.

C. Plaintiff shall, in its operation of the quarry, observe the terms of the present township noise ordinance, and all appropriate federal, state and local noise statutes, ordinances, rules and regulations.

D. Plaintiff shall observe a setback requirement of at least 150 feet around the entire perimeter of its quarry site.

E. Plaintiff shall be responsible, at its cost, for the remediation of any and all adverse impacts upon the viability of wells in the township resulting from its quarry operations and the dewatering thereof, and shall also be responsible, at its cost, for the remediation of any water quality problems caused by its quarry operations. In these regards, plaintiff shall perform the remedial measures, without delay, set forth in its exhibits 7 through 16, inclusive, introduced herein, and shall also take any other measures necessary to accomplish such remediation. These measures shall include, if other measures are insufficient for such remediation, the provision of a public water supply to any property owner suffering an interruption in water supply by reason of quarry operations.

F. Plaintiff shall be responsible, at its cost, for remediation of any adverse effects upon the Davis Swale and its effectiveness and capacity for disposal of storm water and ground water resulting from plaintiff's development and operation of its quarry or from plaintiff's relocation of such swale.

G. Plaintiff shall implement its "Mining and Reclamation Program" upon closing of the quarry as set forth in plaintiff's exhibit 21.

H. Plaintiff shall, prior to operation of the quarry, construct and install berms, provide landscaping, plantings of grass and trees at the perimeter of the quarry site, all as is set forth in plaintiff's exhibit 21, and shall take suitable action for the beautification of the exterior of the quarry site, so as to

reduce insofar as possible any adverse aesthetic effects.

I. Plaintiff shall comply with and meet any and all directives and requirements of the Michigan Department of Transportation governing access to the quarry from Telegraph Road (US–24) and exit to Telegraph Road from the quarry by quarry trucks, and shall provide a safe and reasonable condition for the entrance and exit of such trucks to and from Telegraph Road.

J. Plaintiff shall not place its quarry operations upon the portion of its land abutting and fronting on Telegraph Road and presently designated in the township's master plan for future commercial development, being the land approximately 750 feet deep from Telegraph Road.

K. Plaintiff shall comply, in its development and operation of the quarry, with the rules and regulations of the Michigan Department of Natural Resources, the Michigan Air Pollution Control Commission and any other federal, state or local governmental body or agency having jurisdiction over air quality and pollution.

■ This court will retain jurisdiction in this matter in order to enforce the judgment herein by appropriate future orders. This continuing jurisdiction shall include the right to amend the judgment herein so as to restrict or to further regulate the operation of the quarry, or to enjoin entirely its operation, in the light of conditions as they actually develop.

As hereinbefore stated, the court imposes these restrictions upon the relief granted herein, and retains jurisdiction herein, so as to specify and insure that the plaintiff must proceed in the face of the possibility of being further restricted in its operation of the quarry or of losing its right to operate the quarry, in the event that the basic representations which it has made during the course of the trial are not performed and fulfilled, and to provide for the possibility of restriction or termination of quarry operation in the event that circumstances and conditions as they actually de-velop establish the necessity for such action. The court deems these safeguards necessary, since without them there is no assurance that the quarry operation will proceed as presently planned by the plaintiff. These protections will therefore be afforded to the township, in accordance with the doctrine of the Michigan Supreme Court as set forth in *Certain-teed Products v. Paris Township, supra,* 351 Mich. at pp. 464–465, 88 N.W.2d 705.

## II. INVERSE CONDEMNATION: PLAINTIFF'S CLAIM THAT DEFENDANT'S FAILURE TO PERMIT THE REZONING HAS RESULTED IN A TEMPORARY REGULATORY TAKING OF PLAINTIFF'S MINERAL RIGHTS, ENTITLING PLAINTIFF TO RECOVER DAMAGES.

### A.

#### *Applicable Law*

■ It is clearly established that federal and state governments possess the power to take land for public use. *See County of Ontonagon, Mich. v. Land Located in Dickinson County, Mich.,* 902 F.2d 1568, at 3 (6th Cir.1990) (unpublished disposition) (text available in WESTLAW).

> Government action other than acquisition of title through formal condemnation proceedings (eminent domain), occupancy, or physical invasion may be found to be a taking where government action has destroyed the owner's use and enjoyment of his property thereby depriving the owner of all or most of his interest in the property (inverse condemnation).

*Yuba Natural Resources, Inc. v. United States,* 821 F.2d 638, 640 (Fed.Cir.1987) (*Yuba I*) (citing *United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945)). Whenever a governmental unit effects a taking, the fifth amendment requires the governmental unit to provide "just compensation." *County of Ontonagon,* 902 F.2d 1568, at 3. "In cases involving temporary takings, 'just compensation' ordinarily refers to the 'market rental value' of the property taken." *Id.* (citing *Kimball Laundry Co. v.*

*United States,* 338 U.S. 1, 7, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765 (1949); *General Motors,* 323 U.S. at 382, 65 S.Ct. at 361; *Yuba Natural Resources, Inc. v. United States,* 904 F.2d 1577, 1581 (Fed.Cir.1990) (*Yuba II*); *Yuba I,* 821 F.2d at 641).[2] In other words, if compensation is to be paid to plaintiff, it is to be the "market rental value" of the property without the restriction less the "market rental value" of the property with the restriction in place. *Wheeler v. City of Pleasant Grove,* 833 F.2d 267, 271 (11th Cir.1987); *Nemmers v. City of Dubuque,* 764 F.2d 502, 505 (8th Cir.1985); *see County of Ontonagon,* 902 F.2d 1568, at 3; *see also Kimball Laundry,* 338 U.S. at 7, 69 S.Ct. at 1438 ("[T]he proper measure of compensation ... is the rental that probably could have been obtained...."). Consequential damages are not recoverable as a component of "just compensation" for a temporary taking. *County of Ontonagon,* 902 F.2d 1568, at 3; *see also General Motors,* 323 U.S. at 382, 65 S.Ct. at 361; *United States v. 1735 North Lynn St.,* 676 F.Supp. 693, 701 (E.D.Va.1987).

### B.

### *Findings of Fact*

1. Defendant has issued a zoning ordinance that precludes plaintiff or anyone else from mining or operating a quarry on the Denniston Farm site.

2. Plaintiff requested rezoning from defendant so that mining on the Denniston Farm site could commence.

3. In April 1990, defendant denied plaintiff's rezoning request.

4. Through this denial of plaintiff's request to rezone, defendant has temporarily taken, through inverse conversion, part of the fee known as the Denniston Farm.

5. There is no finding of fact as to the market rental value of the Denniston Farm site without the "agricultural" zoning ordinance, as there was no competent evidence or testimony to support such a finding.

6. The market rental value of the Denniston Farm site for 1990 was $8200.00.

7. The market rental value of the Denniston Farm site for 1991 was $9200.00.

8. The market rental value of the Denniston Farm site for 1992 is $9200.00.

9. The royalty income that could have been earned in 1990, 1991 and 1992 is undeterminable, as there was no competent evidence or testimony to support such a finding.

10. The expected life of the Denniston Farm quarry would be 42 years.

11. The expected average yield per year of aggregate would be 1.1 million tons.

12. The estimated royalty income that could have been earned in 1990, 1991, and 1992, based upon a static per ton average profit of 50 cents, was $550,000.00 each year.

13. The prorated loss to plaintiff for 1990, based upon a static per ton average profit of 50 cents, was $371,079.00.

14. The prorated loss to plaintiff for 1992, based upon a static per ton average profit of 50 cents, is $274,230.00.

15. The gross loss to plaintiff for the years 1990, 1991, and 1992, based upon a static per ton average profit of 50 cents, was and is $1,186,109.00.

16. The present value of the $1,186,-109.00 profit realized at the end of the 42 year life of the quarry, based upon a static per ton average profit of 50 cents, is $21,-659.00.

17. The net loss to plaintiff for the years 1990, 1991, and 1992, based upon a static per ton average profit of 50 cents, was and is $1,164,450.00.

18. The static per ton average profit of 50 cents is an unrealistic figure because is

---

**2.** The Supreme Court has rejected the proposition that "the difference between the market value of the fee on the date of the taking and its market value on the date of its return" was an appropriate measure of "just compensation" for a temporary taking. *Kimball Laundry,* 338 U.S. at 7, 69 S.Ct. at 1438. The Court explained that "there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy." *Id.*

does not take into account market fluctuations in the price of aggregate.

Plaintiff claims that it is entitled to just compensation for the temporary taking of the *Denniston Farm* site. However, the record contains no expert testimony regarding the amount of rent upon which a willing lessor and a willing lessee would have agreed. Plaintiff's experts did give their opinions as to what amount plaintiff could collect in royalties if the Denniston Farm site were operational as a quarry during the period in question. Harold Lynwood Bourne testified that plaintiffs would have collected 50 cents per ton of aggregate mined from the Denniston Farm site. Bourne also testified that 1.1 million tons would be mined per year, garnering plaintiff $550,000.00 in royalties each year over a span of approximately 42 years.

This court finds no reason to dispute these figures. However, these figures reflect royalty income and not rental value. Royalty income represents natural resources removed from the land. Only rental income is compensable, as royalty income will be recoverable once plaintiff begins mining. To grant both market rental value and foregone royalties would be to grant double recovery, as royalties would once again be realized once the quarry is operational.[3] Because there is no evidence of the market rental value of the Denniston Farm site both before and after defendant's zoning ordinance, then this court must grant defendant's motion for judgment as a matter of law and deny plaintiff any relief for the temporary taking.

Plaintiff has attempted, however, to equate the royalty income with the market rental value of the property. Even if plaintiff's attempt to equate the two theories of value is accepted, the theory fails to demonstrate a loss suffered. Plaintiff's expert

Bourne testified that the average royalty income per year would be $550,000.00 based upon 1.1 million tons of aggregate mined at 50 cents a ton. Plaintiff's expert David Edward Burgoyne then testified that the farming rental values of Denniston Farms for all of 1990, with defendant's zoning in place, were $8200.00; and that the farming rental values for 1991 and 1992 would be estimated at $9200.00 each year. Burgoyne then subtracted the farming rent from the expected royalty income for each year and arrived at a loss to plaintiff of $541,800.00 in 1990 and $540,800.00 both in 1991 and 1992. Burgoyne then prorated the losses in 1990[4] and 1992[5] to match the period in question and arrived at a total loss of $1,186,109.00 to plaintiff. Plaintiff's expert then subtracted the present value of the net income collected 42 years in the future at the end of the expected life of the quarry. Burgoyne estimated the present value of this future income to be $21,659.00 discounted at 10% per year. Burgoyne then subtracted this amount from the gross loss noted above ($1,186,109.00) and arrived at $1,164,450.00 for a net loss.[6]

Plaintiff represents that this is the loss it has incurred due to defendant's temporary taking. Plaintiff asserts that this loss is real in present time because plaintiff will not be able to recoup the loss until the final two years of the 42 year expected life of the quarry. Plaintiff further points to the subtraction of the $21,659.00 figure to show its accuracy in taking into account the present value of the future income.

Again, this court finds no reason to dispute the figures as provided by plaintiff and its experts. However, plaintiff fails to take into consideration that the $1,164,450.00 present loss, not recoverable until the years 2032 through 2034, is based upon a static per tonnage average profit of 50

---

3. In this case the increase or decrease of the aggregate during the period in question, and the lost business time, are consequential damages not recoverable by plaintiff. *See County of Ontonagon,* 902 F.2d 1568, at 3; *see also Yuba II,* 904 F.2d at 1581–82.

4. Prorated to 68.49% of the year and a 1990 loss of $371,079.00.

5. Prorated to 49.86% of the year for a 1992 loss of $274,230.00.

6. Neither Burgoyne nor plaintiff offered these exact figures because neither did "these calculations to the individual dollar [but] round[ed] to the nearest thousand or so...." Burgoyne Tr. at 42. Any discrepancies in the record are due to this.

cents. If, as is the case, the life span of the quarry is shifted from 1990–2032 to 1992–2034, the per tonnage average profit would also shift to accommodate inflation which is reflected in plaintiff's 10% discount rate. The 50 cent per ton average profit is not contractual but an estimate of the market values of the aggregate. Any future market adjustment in the profit per ton would negate the loss suffered by plaintiff because the materials would still remain. No loss in royalties would occur as no aggregate would have been removed. The shift in operating years would shift not only the time when plaintiff would realize its profits but also increase (or decrease)[7] its profits in step with inflation and the market. The 50 cents per ton average profit would shift up (or down) and therefore take into account plaintiff's deferred profits. If the 50 cents per year average profit were binding upon plaintiff in a contract in place and in existence at this time, then plaintiff's analysis would hold true. However, because there is no contract to hold the per ton average profit at 50 cents, the market will negate plaintiff's losses.

### C.

#### Conclusions of Law

After reviewing the testimony and exhibits, this court concludes that, because plaintiff has failed to present any testimony or evidence indicating the market rental value of the Denniston Farm site both before and after defendant's zoning ordinance, this court cannot grant plaintiff's request for compensation due to defendant's temporary taking. Further, even if plaintiff's argument that royalty income is equivalent to rental income is accepted, plaintiff's computations show that, if the market value of the aggregate is taken into account, no loss has been suffered by plaintiff due to defendant's temporary taking. Hence, plaintiff's prayer for just compensation for the temporary taking of the Denniston Farm site through inverse condemnation by defendant is denied.

**7.** Again, any change in the market value of the aggregate would be consequential and therefore

### III. SUMMARY

Plaintiff shall be awarded injunctive relief so as to restrain defendant from enforcing its zoning ordinance in such manner to prevent contemplated development and operation of a stone quarry on the subject premises, subject to the conditions hereinabove set forth.

Plaintiff is not entitled to recover any damages from defendant.

No costs are awarded, each party having prevailed in part.